536 So.2d 234 (1988)
C.F. INDUSTRIES, INC., et al., Appellants,
v.
Katie NICHOLS, et al., Appellees.
No. 70196.
Supreme Court of Florida.
December 22, 1988.
*235 Julian Clarkson and Michael L. Rosen of Holland and Knight, Tallahassee, and Earle H. O'Donnell and Laurel W. Glassman of Sutherland, Asbill & Brennan, Washington, D.C., for appellants.
Susan F. Clark, Gen. Counsel and David E. Smith, Director, Div. of Appeals, Florida Public Service Com'n, Alan C. Sundberg, Tallahassee, and Sylvia H. Walbolt and Gary L. Sasso, Tampa, of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., for Florida Power Corp., G. Edison Holland, Jr. and Jeffrey A. Stone of Beggs & Lane, Pensacola, for Gulf Power Co., and Matthew M. Childs and Charles A. Guyton of Steel, Hector & Davis, Tallahassee, for Florida Power & Light Co., for appellees.
SHAW, Justice.
We review Public Service Commission (PSC) order 17159, issued 6 February 1987, as modified by order 18418, issued 10 November 1987. We have jurisdiction. Art. V, § 3(b)(2), Fla. Const.
Appellants generate electricity as a byproduct of their primary activities. This electricity is variously consumed by the activities themselves, sold directly to other consumers of electricity, or sold to public utilities for resale to utility customers. Despite their ability to generate electricity, appellants continue to require and receive electric service from public utilities. The PSC order on appeal addresses issues concerning certain additional electric services which are uniquely provided to such selfgenerators by public utilities. Appellants challenge the PSC order on state law grounds and urge that we limit our consideration accordingly. We do so, but, as will become apparent, the proceedings which led to the orders under review were initiated largely to satisfy companion provisions of both state and federal law and cannot be understood without reference to the interrelationship of state and federal law.
The genesis of these proceedings is the Public Utility Regulatory Policies Act of 1978 (PURPA), Public Law 95-617, 92 Statute 3117. Section 210 of PURPA, titled "Cogeneration and Small Power Production," mandates that the Federal Energy Regulatory Commission (FERC) prescribe rules requiring that electric utilities offer to (1) sell electric energy to qualifying cogeneration facilities and qualifying small power production facilities, and (2) purchase electric energy from such facilities. Id. § 210(a). Subsection 210(c) prescribes that rates for sales by utilities to qualifying facilities (QFs) shall (1) be just and reasonable and in the public interest, and (2) not discriminate against QFs. Subsection 210(f) requires that state regulatory authorities commence implementation of FERC rules within one year of their promulgation. Judicial review of proceedings by state regulatory authorities may be had in state courts. Id. § 210(g).
In response to PURPA, FERC has promulgated regulations pertaining to QFs. 18 C.F.R. Part 292 (1985). Subsections 292.303(a) and (b) require electric utilities to purchase and sell electricity from and to QFs. Subsection 292.305(a)(1) provides that rates for sales to QFs shall be just and reasonable and in the public interest and shall not discriminate against QFs in comparison to rates for sales to other customers served by the utility. Subsection 292.305(a)(2) provides, however, that
[r]ates for sales which are based on accurate data and consistent systemwide costing principles shall not be considered to discriminate against any qualifying facility to the extent that such rates apply to the utility's other customers with similar *236 load or other cost-related characteristics.
Subsection 292.305(b) also requires that, upon request, electric utilities provide QFs with additional services: (1) supplementary power, (2) backup power, (3) maintenance power, and (4) interruptible power. These requirements may be waived, however, if the utility demonstrates, and the state regulatory authority finds, that the provision of such additional services will either (1) impair the utility's ability to provide adequate service to its customers or (2) place an undue burden on the utility. By definition, (1) supplementary power is electric energy or capacity supplied by a utility, regularly used by a QF in addition to the self-generated power of the QF; (2) backup power is electric energy or capacity supplied by a utility to replace energy ordinarily generated by a QF which is unavailable because of an unscheduled outage of the generating facility; (3) maintenance power is electric energy or capacity supplied by a utility during scheduled outages of the QF generating facility; and (4) interruptible power is electric energy or capacity supplied by a utility which is subject to interruption by the utility under specified conditions. Id. § 292.101(b). Standby power, as used herein, is an umbrella term which encompasses both backup and maintenance power. Subsection 292.305(c) provides that the rates for sales of standby power shall not be based on the assumption, unless supported by factual data, that forced outages or other reductions in electric output by all QFs will occur simultaneously or during the electric system's peak demand and shall take into account the extent to which scheduled outages of QFs can be usefully coordinated with scheduled outages of the utility's facilities. Subsection 292.401(a) provides that state regulatory authorities shall commence implementation of the preceding rules within one year of their effective date. Such implementation may be by the issuance of regulations, the resolution of disputes between QFs and utilities, or by any other reasonable means.
Florida law is consistent with, and supports, the provisions of PURPA and FERC regulations concerning QFs. Ch. 366, Fla. Stat. (1985). Subsection 366.05(1) authorizes the PSC to prescribe fair and reasonable rates, charges, and classifications and to secure adequate services or facilities for those reasonably entitled thereto. Subsection 366.05(9) authorizes the PSC to establish guidelines and set rates for the purchase of power by public utilities from cogenerators or small power producers. Subsection 366.06(2) requires the PSC to determine reasonable rates to be charged for utility services and to promulgate rules and regulations affecting equipment, facilities, and services. Subsection 366.06(1) requires the PSC to fix fair, just and reasonable rates for each customer class based on the cost of providing service to the class as well as the rate history, value of service, experience of the utility and the consumption and load characteristics of the various customer classes. After public hearings, the PSC is required to determine and by order fix fair and reasonable rates or classifications and reasonable rules, regulations, or services. Id. § 366.07. Section 366.81 expresses legislative intent to encourage the use of solar energy, renewable energy sources, highly efficient systems, and load control systems, and directs the PSC not to approve any rates or rate structures which discriminate against any class of customers because of the use of such systems or devices. With this background information in mind, we now turn to the facts and legal issues of the case at hand.
In 1981, the PSC initiated rulemaking procedures as a first step in implementing the requirements of PURPA and Florida law for the purchase and sale of QF generated power. Fla. Admin. Code Rules 25-17.080-.089. Rule 25-17.082, titled "The Utility's Obligations to Purchase," as amended in 1983, provides in pertinent part:
Should a qualifying facility elect to make simultaneous purchases and sales, purchases of electric service by the qualifying facility from the utility shall be billed at the retail rate schedule under which the qualifying facility would receive service as a non-generating customer of the utility; sales of electricity by *237 the qualifying facility to the utility shall be purchased at the utility's avoided energy and capacity rates, where applicable, in accordance with Rules 25-17.0825 and 25-17.083.
Should a qualifying facility elect to make net sales, the hourly net energy and capacity sales to the utility shall be purchased at the utility's avoided energy and capacity rates, where applicable, in accordance with Rules 25-17.0825 and 25-17.083. For those hours during which a qualifying facility is a net purchaser, purchases from the utility shall be billed at the utility's retail rate schedule under which the qualifying facility would receive service as a non-generating consumer of the utility.
Fla. Admin. Code Rule 25-17.082(3)(f).
This first step in implementation did not, however, mandate the requirements of state and federal law that QFs be furnished the additional services of supplementary, standby, and interruptible power and the requirement that rates for such services be based on the traditional cost of providing the services. Accordingly, in 1985, the PSC initiated these proceedings, titled In re: Generic Investigation of Standby Rates for Electric Utilities. Parties included the PSC staff, the four major public utilities in the state, and intervenors Metropolitan Dade County and eight industrial cogenerators.[1] Workshops were conducted in February-May 1986 with all parties submitting draft tariffs on standby rates for consideration. The PSC decided that specific determinations to be made were not sufficiently ripe for rulemaking and that the process could be foreshortened by conducting a hearing in accordance with section 120.57(1), Florida Statutes (1985). The four major utilities were directed to file proposed tariffs to be considered at a hearing in August 1986, and all concerned were ordered to file prehearing statements of issues to be considered and a summation of their positions on those issues. All parties did so and also submitted prefiled direct and rebuttal testimony by selected expert witnesses. After the hearings, parties also submitted legal briefs. After the PSC entered the order under appeal in February 1987, industrial cogenerators petitioned for reconsideration, raising the single issue of the confidentiality of reports required of them under the PSC order. Reconsideration was granted and the PSC modified its order to ensure confidentiality was preserved.
The principal findings of the PSC, as pertinent here, are as follows. First, on the record before it, the PSC found that the load characteristics for supplementary power did not significantly differ from those for full requirement power furnished to non-generating customers. Consequently, the rates for supplementary power should be those charged to non-generating customers. The PSC recognized, however, that future operating experience and data collection might show distinctions justifying a separate rate. Second, on the record before it, the PSC found that the expected load characteristics of self-generating customers were sufficiently distinctive to justify separate rates for standby power. Consequently, the PSC prescribed a cost-based formula for determining rates to be charged for standby power service which incorporated time-of-use pricing and permitted seasonal adjustments. Third, on the record before it, the PSC was unable to find a cost-based justification for establishing different rates for both backup and maintenance power. However, the PSC recognized that in theory different rates might be justified if the utility and self-generating customer were able to schedule maintenance downtime to avoid the utility's peak load periods. Accordingly, the PSC directed the collection of data which, after sufficient operating experience, might justify separate rates for backup and maintenance power service. In the interim, the PSC found that utilities could offer discounts to self-generating customers who usefully coordinate their maintenance power *238 schedule with the utility.[2] Fourth, using cost-of-service concepts, the PSC found that a single rate for standby power service should be mandatory for all customers requesting such service unless the customer demonstrates that its load characteristics resemble those of full requirement, non-generating customers. Two possible exceptions were noted: (1) customers whose generators are used for emergency purposes only, and (2) customers whose total generating capacity is less than twenty percent of the customer's total electrical load.
Appellants raise two challenges to the PSC order. First, it is argued that rule 25-17.082(3)(f) provides that QFs may purchase electricity at the same rate as that charged to non-generating customers, that this rule is applicable to the purchase of standby power, and that the PSC order, by establishing separate, mandatory rates for standby service, is contrary to rule 25-17.082(3)(f). In support, appellants cite subsection 120.57(1)(a)(12), Florida Statutes (1985), which mandates that a reviewing court remand to the agency all cases where the agency's exercise of discretion is inconsistent with an agency rule. Appellees respond that this claimed conflict was not raised below, that appellants urged the PSC to establish separate rates for standby service and introduced expert testimony supporting that position, and, finally, assuming there is conflict with the rule, the rule must give way to state and federal law which requires that fair and reasonable rates be established based on the traditional cost-of-service concept. We agree with appellees. This claimed conflict with the rule was not raised below where appellants' position was that standby services were distinctive, requiring separate rates from those charged to full requirements, non-generating customers. Castor v. State, 365 So.2d 701 (Fla. 1978). It is also clear from the record that appellants' reading and application of rule 25-17.082(3)(f) would be contrary to the provisions of chapter 366 which require fair and reasonable rates based on, inter alia, cost-of-service and load characteristics.[3] In a variation of their argument, appellants urge that they did argue below that standby rates should be optional and QFs should have the choice of either standby service rates or full requirement service rates. Although this argument was not clearly or forcefully made, was not raised in the petition for reconsideration, and is basically inconsistent with appellants' position that standby rates are distinguishable from other types of service, the record does show that the point was raised. We see nothing in the PSC order that mandates that QFs request either supplementary or standby service.[4] However, a QF which chooses supplementary service only at the applicable rate cannot rationally expect the utility to also furnish an additional service with different load characteristics, i.e., standby service, at the supplementary service rate unless it demonstrates that its load characteristics resemble those of full requirements, non-generating customers. This would be contrary to Florida law discussed above and an abuse of discretion for the PSC to permit such practice even if both the QF and utility desired it. In setting rates, the PSC has a two-pronged responsibility: rates must not only be fair and reasonable to the parties before the PSC, they must also be fair and reasonable to other utility customers who are not directly involved in the proceedings at hand. Standby rates which did not recover the cost-of-service would unfairly discriminate *239 against other customers by requiring them to subsidize the standby service.
Appellants' second challenge is that minimum demand components of the formula used by the PSC to establish rates for standby services discriminate against QFs in violation of section 366.81. Providing standby services, which may not be used or which may be seldom used, entails fixed costs to the utilities which cannot be recovered on the basis of metered electric usage.[5] For this reason, the PSC formula includes components to recover those costs which are recovered from full requirement, non-generating customers using metered electric usage. Essentially, QFs requesting standby services advise the utility of the standby power demand they expect to make on the utility in order to replace their generated power during scheduled and unscheduled outages. Based on this potential demand, the parties contract for a minimum reservation charge which is paid even if no actual demands occur and no electricity is consumed. The potential demand could be the capacity of the QF generating facility but the QF might choose to select a lesser demand by curtailing all or part of its primary operations during the outage periods and avoiding excess demand charges. If it did so, the minimum reservation charge would be reduced accordingly. QFs differ in reliability of their generating equipment and some will suffer more outages than others, creating larger and irregular demands which may exceed the demand figure contracted for. To cover the cost of these excess demands, the PSC order contains a proviso which "ratchets" up the contracted demand to the actual demand placed on the utility. This ratchet figure replaces the contract figure for the next twenty-four months unless it is in turn exceeded by another higher demand figure. Appellants claim that this ratchet provision discriminates against QFs because such ratchets are not used for non-generating customers. In support, appellants cite section 366.81 which states that the PSC shall not approve any rate or rate structure which "discriminates against," e.g., QFs. Appellants urge that the absence of "unjust," "undue," or "unreasonable" as modifiers of discriminates means that any rate structure for QFs which is not the same as that for non-generating customers is per se discriminatory. We do not so read section 366.81 and find appellants' argument unpersuasive. Rates are not discriminatory simply because they are different for different classes of customers. Tampa Electric Co. v. Cooper, 153 Fla. 81, 14 So.2d 388 (1943). Reading section 366.81 in pari materia with other provisions of chapter 366 which mandate that rates be fair and reasonable and reflect the cost of providing the service and load characteristics, we do not believe the legislature used "discriminates" in the sense which appellants urge. Our conclusion is reinforced by the provisions of section 210 of PURPA and FERC section 292.305 which also speak of "discriminate against" but make clear that discriminate does not mean rates based on cost-of-service principles. Appellants also argue that ratchets are not used in rate structures for non-generating customers and were in fact deliberately abandoned in 1981-83. In support, appellants point out that the PSC acknowledged in its order that it intends to investigate and consider ratcheted charges for all customers in future rate cases. We express no view on whether ratchets should be used for other classes of customers. The PSC has found, as appellants below urged, that standby services for self-generating customers are sufficiently distinctive to justify separate rates. Indeed, expert witnesses for appellants testified that a ratchet system was required in order to recover the costs of providing standby services. The record supports the PSC finding.
The PSC found that the standby rates adopted would, in general, reward standby customers with reliable generating systems who place less irregular demands on utilities than standby customers with less reliable systems who place greater irregular *240 demands on utilities. The PSC rate structure also contains provisions whereby standby customers may, at their option, demonstrate that their load characteristics are equivalent to full requirements, non-generating customers. Finally, the PSC order recognizes that the rate structure is subject to adjustment based on collected data and operational experience. The approach adopted by the PSC appears to be fully equitable and, for the most part, is the approach urged on it by appellants. We see no discrimination against self-generating customers and no violation of Florida law. We affirm the order below.
It is so ordered.
EHRLICH, C.J., and OVERTON, McDONALD, GRIMES and KOGAN, JJ., concur.
BARKETT, J., concurs in result only.
NOTES
[1] Initially, all eight cogenerators appealed the PSC order. Six of these cogenerators have voluntarily dismissed their appeal: C.F. Industries, Inc.; Conserv, Inc.; IMC Fertilizer, Inc.; The Monsanto Company; The Royster Company; and W.R. Grace & Co. The remaining appellants are Florida Crushed Stone Company and Occidental Chemical Corporation.
[2] Appellants argued to the PSC that QFs should not be required to give advance notice of scheduled maintenance. This position negates the possibility of useful coordination with the utility. The PSC compromises the point by offering discounts for QFs who usefully coordinate the maintenance outages.
[3] The PSC has initiated rulemaking proceedings to resolve any ambiguity or conflict in rule 25-17.082.
[4] QFs may, of course, request either supplementary or standby service and may also request firm supplementary and interruptible standby services, or vice versa. Electric power consumed in excess of self-generated capacity is treated as supplementary power under the PSC order.
[5] As urged by appellants, the PSC adopted a single standby rate for all utilities rather than permit individual rates for each utility.