United States Court of Appeals,

Eleventh Circuit.

Nos. 94-4323, 94-4496.

TEC COGENERATION INC., RRD Corporation, as they are partners in South Florida Cogeneration Associates, Thermo Electron Corporation, Rolls-Royce, Inc., Plaintiffs-Appellees,

v.

FLORIDA POWER & LIGHT COMPANY, FPL Group, Inc., FPL Energy Services, Inc., Defendants-Appellants,

Wayne H. Brunetti, Larry T. Atkinson, Joe C. Collier, Jr., Clark Cook, et al., Defendants.

March 8, 1996.

Appeals from the United States District Court for the Southern District of Florida. (No. 88-2145-CIV-Atkins), C. Clyde Atkins, Judge.

Before EDMONDSON, Circuit Judge, HILL, Senior Circuit Judge, and MILLS[*], District Judge.

HILL, Senior Circuit Judge:

This is an appeal from the denial of a motion for summary judgment by the district court.[1] Two questions are presented: first, whether a public utility is immune from antitrust liability under the state-action doctrine of *Parker v. Brown,* 317 U.S. 341,

---

[*]Honorable Richard Mills, U.S. District Judge for the Central District of Illinois, sitting by designation.

[1]We exercise dual jurisdiction in this case. 28 U.S.C. §§ 1291, 1292(b). The denial of a motion for summary judgment under the state-action immunity doctrine is immediately appealable under the collateral order exception to the final judgment rule. *See Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); *Praxair, Inc. v. Florida Power & Light Co.,* 64 F.3d 609, 611 (11th Cir.1995). In addition, the district court certified its summary judgment order for immediate appeal and this court granted Appellants' protective petition for permission to appeal pursuant to 28 U.S.C. § 1292(b). The appeals were then consolidated by order of this court as they both involve the same parties and the same issues, and are taken from the same summary judgment order.

63 S.Ct. 307, 87 L.Ed. 315 (1943), for its allegedly anti-competitive conduct concerning a cogenerator[2] in the areas of wheeling,[3] rates, and interconnection; and second, whether lobbying of a county legislative body by the utility is protected from antitrust liability under the *Noerr/Pennington* doctrine. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The district court found that the utility was not entitled to immunity from antitrust sanctions for its actions. We disagree. The denial by the district court of the utility's

---

[2]Cogeneration is the production of electricity and useful thermal energy at a single facility. The Public Utility Regulatory Policies Act of 1978 (PURPA), Pub.L. No. 95-617, 92 Stat. 3117 (1978), defines a cogeneration facility as a facility that produces electric energy and steam, or other forms of useful energy, such as heat, for industrial, commercial, heating, or cooling purposes. 16 U.S.C. § 796(18)(A). Cogeneration can be an efficient use of fuel because a cogeneration facility (unlike some more traditional power plants) can utilize thermal energy that might otherwise be a wasted by-product in the production of electricity. For example, the Miami downtown cogeneration facility that is the subject of this case has the capability to produce both electricity for the Downtown Government Center and chilled water for air conditioning. PURPA directs the Federal Energy Regulatory Commission (FERC) to promulgate rules to facilitate cogeneration and to purchase electricity from cogeneration and small power production facilities at a rate that does not exceed the incremental cost to the electric utility of alternative electric energy; state utility commissions are then directed to implement and expand FERC rules at the state level. 16 U.S.C. § 824a-3.

[3]Wheeling electric power means to transfer, by direct transmission or displacement, electric power from one utility to another over the facilities of an intermediate utility. *See Otter Tail Power Co. v. U.S.,* 410 U.S. 366, 368, 93 S.Ct. 1022, 1025, 35 L.Ed.2d 359 (1973).

motion for summary judgment is reversed.[4]

## I. FACTUAL BACKGROUND

Shortly after Congress enacted the Public Utility Regulatory Policies Act of 1978 (PURPA),[5] Metropolitan Dade County, Florida (Dade) began to consider a cogeneration facility as part of its Miami Downtown Government Center (Center), then in the planning stages. At the time, Appellees (Cogenerators[6] were engaged in the business of developing cogeneration projects nationwide. They also

_____

[4]Although not styled as such, we note that the motion for summary judgment ruled upon by the district court was really a motion for *partial* summary judgment. Our determination here does not entirely resolve the dispute between these parties as other claims remain to be resolved on remand.

[5]Prior to PURPA, and for most of the twentieth century, electric utilities were given monopoly franchises to take advantage of the cost benefits of centralized production. Douglas Gegax & Kenneth Nowotny, *Competition and the Electric Utility Industry: An Evaluation,* 10 Yale J. on Reg. 63 (1993). In return, the utility gave the state the right to regulate price and service quality, restrict profit rates, and veto investment decisions. It vested the state with the authority to balance consumer and stockholder interests. *Id.* Following the 1973 Arab oil embargo, the public began to perceive a worldwide energy crisis and, in the late 1970's, the practice of monopolist utilities was disrupted as Congress and the executive branch took a number of steps to respond to this problem. *Id.* at 64. PURPA was one such Congressional response. Its passage marked the beginning of a radical change in the status quo for utilities. PURPA encouraged fuel conservation and efficient pricing by relaxing restrictions on entry into the (former monopolist's) service area. It also encouraged the development of cogeneration. *Id.; see American Paper Institute, Inc. v. American Elec. Power Service Corp.,* 461 U.S. 402, 404-05, 103 S.Ct. 1921, 1923-24, 76 L.Ed.2d 22 (1983). Historically, utilities were reluctant to purchase power from and to sell power to the nontraditional cogeneration facility. *F.E.R.C. v. Mississippi,* 456 U.S. 742, 750-51, 102 S.Ct. 2126, 2132-33, 72 L.Ed.2d 532 (1982); *supra* n. 2.

[6]TEC Cogeneration, Inc. (TEC) is a subsidiary of Appellee Thermo Electron Corporation (Thermo). RRD Corp. (RRD) is a subsidiary of Appellee Rolls-Royce, Inc. (Rolls-Royce). TEC and RRD are joint venture partners in the partnership South Florida Cogeneration Associates, also an Appellee.

supplied turbines and related services for use in cogeneration projects. The Cogenerators encouraged Dade to construct such a facility using their equipment and services.

Appellant Florida Power & Light Company (FPL)[7] is an investor-owned public electric utility engaged in three functions: generation, transmission, and distribution and sale of electric energy.[8] It services southern and eastern Florida, including most of Dade. FPL is regulated by the Florida Public Service Commission (PSC).[9] It owns and controls ninety percent of the total

---

[7]Appellant FPL Group, Inc., is a public utility holding company, subject to the provisions of the Public Utility Holding Company Act of 1935 (PUHCA). As FPL's parent corporation, it owns all its capital stock. Appellant FPL Energy Services, Inc., itself a cogeneration project developer, is a one hundred percent-owned subsidiary of FPL Group Capital, Inc., which in turn is a one hundred percent-owned subsidiary of FPL Group, Inc.

[8]FPL is the fifth largest electric utility in the United States. It is an integrated electric utility that performs three functions (generation, transmission, distribution and sale) via a transmission system integrated within an interstate power grid. FPL generates electricity by transforming heat, moving water, or other forms of energy into electric power. In so doing, it uses large quantities of oil, natural gas, and bituminous coal. These substances are transported into Florida through interstate commerce. Within Florida, FPL generates electricity at licensed nuclear power plants. FPL transports electric power from generating plants through electric transmission facilities to distribution points. From there, delivery and sales are made to ultimate consumers.

[9]In 1981, the Florida Legislature authorized and directed the Florida Public Service Commission (PSC) to develop state regulations on the relationship between cogenerators and Florida's electric utility companies. 1981 Fla.Laws. ch. 81-131, § 1 (codified as amended at Fla.Stat. § 366.05 (1994)). The PSC is charged with exclusive legislative authority under Chapter 366, Florida Statutes, to regulate electric utilities, including investor-owned electric utilities, municipal electric utilities, and rural electric cooperatives in the state. The PSC exercises the state's police power by ensuring safe, adequate, and reliable electric service at fair, just, and reasonable rates. Pursuant to Chapter 366 and PURPA, the PSC also exercises extensive

electrical generating capacity in its service area and the electrical grid with which Center can interconnect. FPL has monopoly power within its service area both as to the purchase of wholesale power and the sale of retail power.

In 1981, Dade issued requests to bid on the Center cogeneration facility. Cogenerators' proposal was selected and in late 1983, Dade and the Cogenerators entered into contracts providing for the construction and operation of a twenty-seven megawatt cogeneration facility at Center and for the supply of cogeneration equipment for the project. The Cogenerators agreed to operate Center for Dade for sixteen years. The Cogenerators also contracted to supply electrical and thermal power to Dade.[10] Dade and the Cogenerators were to share in the profits, if any, from operating the Center; the Cogenerators were to absorb the losses[11]. The final contract allowed for excess power, if any, from Center, to be dispensed to Dade facilities outside Center, such as to the Jackson Memorial Hospital/Civic Center complex (Hospital). [12]

authority over the relationship between electric utilities and cogenerators. It seeks to balance competing interests: the encouragement of cost-effective cogeneration on one hand and the avoidance of its subsidization by utility ratepayers on the other.

[10]The generation facilities themselves are owned by an investment group, Florida Energy Partners, that has no ownership affiliation with the Cogenerators.

[11]For the initial sixteen-year period of operation, Center was projected to generate cumulative profits of approximately seventy-five million dollars.

[12]Although FPL was not a party to the final contract, it participated in its negotiation. An early draft contained a best efforts clause that provided that, if electrical demand at Center proved inadequate to absorb output, Dade would use Center power at other Dade facilities, municipal buildings, and state

Practically speaking, excess power could be dispensed only one of two ways, either via a wheeling arrangement with FPL or by constructing a separate transmission line. A separate line would require the approval of the local legislative body, *i.e.,* the Dade County Board of Commissioners (Commission). With these parameters in place, construction of the cogeneration facility commenced in mid-1984 and the facility became fully operational at the end of 1986.[13]

Center, armed with the capability to produce twenty-seven megawatts of electrical power, actually needed only ten megawatts with which to operate. With seventeen surplus megawatts of generating capacity, Center quickly proved to be unprofitable. By then, however, the die was cast; the project was in place. [14] Fingers began to point as the Cogenerators and Dade each blamed the other for a projection miscalculation of this magnitude.[15]

---

buildings. FPL objected to the provisions concerning municipal and state buildings, claiming they were in violation of Florida law prohibiting retail sales of electricity to unrelated third parties. *E.g., PW Ventures, Inc. v. Nichols,* 533 So.2d 281 (Fla.1988) (a cogenerator may consume the electricity it generates itself or sell it wholesale to utilities; it may not make retail sales to third parties). Dade and the Cogenerators agreed to make the contract changes.

[13]About this time, with the help of a consulting firm, FPL began conducting an eighteen-month study about the effects (including the potential threat) of cogeneration on it and its ratepayers, entitled "Strategic Energy Business Study" (SEBS).

[14]During the initial sixteen-year period of operation, Cogenerators sustained estimated losses of several thousand dollars per month. When the record was closed in 1989, Cogenerators calculated cumulative losses of over sixty million dollars.

[15]Cogenerators filed separate suit in Florida state court charging Dade with fraudulently overstating Center's projected electrical demands. This litigation was settled in 1994.

To reduce their losses, the Cogenerators sought a logical use for the excess power. Under rules promulgated by the PSC, two options were immediately available: (1) the Cogenerators could either sell the surplus electricity to FPL at a rate equal to FPL's avoided cost;[16] or (2) the Cogenerators could force FPL to transmit or wheel the excess power to another Florida utility, who in turn would purchase it at its own avoided cost rate.

At avoided cost rates, it appeared that the Cogenerators could not break even with either option. FPL alleges that the Cogenerators deliberately ignored their two legitimate options and pursued a third, allegedly illegitimate, alternative in order to obtain higher prices for their power: the Cogenerators approached FPL to wheel their surplus power to other Dade facilities *outside* Center, most notably, to Hospital, two miles northwest. Believing that the Cogenerators' request violated the PSC's self-service wheeling rules,[17] FPL declined to wheel.

Rebuffed by FPL, the Cogenerators then turned to the best efforts clause in its contract with Dade. They directed Dade, in effect, to petition the PSC for an order *compelling* FPL to wheel

---

[16]Under PURPA and implementing federal and state regulations, utilities are required, upon request, to purchase the power output of cogeneration facilities at a price equal to what it would have cost the utility to generate that power, or its avoided cost rate.

[17]Under PSC regulations, the Cogenerators can ask FPL to wheel electricity from Center to Hospital only if they qualify under the self-service wheeling rules: (1) there must be an exact identity of ownership between the generator and the consumer of the electricity; and (2) wheeling will not increase rates to utility, *i.e.,* FPL ratepayers. Fla.Admin.Code R. 25-17.0882. Under Florida law, a cogenerator may not sell electricity at retail. *PW Ventures,* 533 So.2d at 281.

power from Center to other Dade facilities, including Hospital.

After an eleven-month administrative proceeding, the PSC denied Dade's petition. The PSC found that Dade could not comply with the PSC's self-service wheeling rules because Dade did not actually own the generating equipment that produced the power to be wheeled; did not generate the power to be wheeled; and was contractually bound to purchase the electricity from the Cogenerators.[18] Hence, the PSC found, *by definition,* that Dade could not "serve oneself." *Petition of Metropolitan Dade County for Expedited Consideration of Request for Provision of Self-Service Transmission,* Order No. 17510, Docket No. 860786-EI, 87 FPSC 5:32, 35-37 (May 5, 1987).[19]

After the PSC wheeling disallowance, the Cogenerators played their fourth and final card: what can't be sent *indirectly,* send *directly.* They approached Dade with a proposal to construct a separate transmission line from Center to Hospital. A separate line would reduce surplus electricity without being dependent upon wheeling by FPL at avoided cost rates. A joint submission was made by the Cogenerators and Dade to Commission for its approval. The Cogenerators lobbied Commission for approval; FPL lobbied against. The Commission voted five-to-one against the construction of the separate transmission line.

---

[18]The fact that Dade had legal title to the building in which the electrical generating equipment was housed was not controlling. The PSC also saw no merit to Dade's argument that its option to purchase the cogeneration equipment was the equivalent of equitable title.

[19]The PSC did not address the impact, if any, of the wheeling request upon other FPL customers.

Within weeks, the Cogenerators filed this suit.

## II. PROCEDURAL BACKGROUND

The Cogenerators contend they suffered losses at Center due to FPL's anti-competitive conduct in three areas: (1) by FPL's refusal to wheel, when FPL allegedly prevented Cogenerators from providing service to Hospital; (2) by FPL's manipulation of its rate structure (when FPL allegedly offered lower rates to customers considering cogeneration; paid cogenerators too little for their excess power; and proposed higher rates for backup power sold to cogenerators); and (3) by FPL's interference with interconnection (when FPL allegedly imposed unreasonable terms in the interconnection agreement governing the manner in which Center is physically connected to FPL's system).[20]

After discovery, FPL filed a motion for summary judgment. The district court heard oral argument in 1989 and 1993. In 1994, the district court denied summary judgment.

This appeal follows.

## III. STANDARD OF REVIEW

Application of the state-action and *Noerr/Pennington* immunity

---

[20]The Cogenerators' complaint, asserting antitrust and tortious-interference claims, was filed in November 1988. An amended complaint was filed in March 1989. Count One of the amended complaint claims that FPL's actions constituted an unlawful monopoly and unlawful attempts to monopolize trade in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; Count Two claims that the conduct constituted an unlawful conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; Count Three claims that FPL's actions constituted unlawful discrimination in price or services or facilities furnished to customers, in violation of Section 2 of the Clayton Act, as amended by the Robinson Patman Act, 15 U.S.C. § 13; Count Four claims that FPL tortiously interfered with the Cogenerators' contractual relations in violation of common law.

doctrines is a question of law. *See F.T.C. v. Hospital Bd. of Directors of Lee County,* 38 F.3d 1184, 1187 (11th Cir.1994). As the question of immunity is strictly one of law, this court makes a *de novo* determination of whether the district court erred in denying summary judgment. *Bolt v. Halifax Hosp. Medical Center,* 980 F.2d 1381, 1384 (11th Cir.1993).

## IV. DISCUSSION

A. *Introduction*

FPL's motion for summary judgment relies principally on two immunity doctrines: the state action immunity doctrine and the *Noerr/Pennington* immunity doctrine. The district court denied summary judgment under both.

We review each of these findings *de novo.*

B. *The State Action Immunity Doctrine*

The Supreme Court first articulated the state-action immunity doctrine in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In *Parker,* the Court grappled with the applicability of the Sherman Act to a California agricultural statutory program intended to restrict competition among private producers of raisins in order to stabilize prices and prevent economic waste. Relying on principles of federalism and state sovereignty, the Court refused to find that the Sherman Act was "intended to restrain state action or official action directed by a state" and determined that "[t]here is no suggestion of a purpose to restrain state action in the Act's legislative history." *Id.* at 351, 63 S.Ct. at 313. The Court held, therefore, that federal antitrust laws were not intended to reach state-regulated anticompetitive activities.

*Id.* at 350-52, 63 S.Ct. at 313-14;  *City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 370, 111 S.Ct. 1344, 1348, 113 L.Ed.2d 382 (1991).[21]

Thirty-seven years later, in *California Retail Liquor Dealers Ass'n. v. Midcal Aluminum, Inc.,*  445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), a unanimous Court established a two-pronged test to determine when private party anticompetitive conduct is entitled to state action immunity from antitrust liability:  (1) the conduct had to be performed pursuant to a clearly articulated policy of the state to displace competition with regulation;  and (2) the conduct had to be closely supervised by the state.  *Id.* at 105, 100 S.Ct. at 943;  *see also F.T.C. v. Ticor Title Ins. Co.,* 504 U.S. 621, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992).[22]  These two prongs are addressed below.

1. *Clearly Articulated Policy of the State.*

The Court set out the first element of state action immunity in *Southern Motor Carriers Rate Conference, Inc. v. U.S.,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985).  There, the Court

---

[21]The *Parker* Court held that the purpose of the Sherman Act "was to suppress combinations to restrain competition and attempts to monopolize by individuals and corporations."  The Act did not prohibit anticompetitive restraints prescribed by the states "as an act of government."  317 U.S. at 352, 63 S.Ct. at 314.

[22]The clear articulation requirement ensures that antitrust law will not be set aside unless the state does in fact intend to displace competition, *i.e.,* the challenged scheme does not simply represent unsanctioned private conduct. *See generally* 1 P. Areeda & D. Turner, *Antitrust Law* 207, 214 (1978).  The active supervision requirement ensures that even where there is state authorization, such authorization constitutes more than mere permission to violate the Sherman Act.  A state may displace the Act, but in doing so it must replace it with a scheme of state regulation.  *Id.* at 213.

determined that a private party acting pursuant to an anticompetitive regulatory program need not "point to a specific, detailed legislative authorization" for its challenged conduct. *Id.* at 57, 105 S.Ct. at 1726. As long as the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure, the first prong of the *Midcal* test is satisfied. *Id.* at 64, 105 S.Ct. at 1730.

In this case, the district court found that Florida has two statutory policies regarding power generation and transmission: a policy favoring monopoly power in Florida electric utilities, and a policy of encouraging development of Florida cogeneration facilities, complemented by the implementation of PSC regulatory guidelines. Fla.Stat. § 366.051 (1991). The district court found that these statutes set out clearly articulated policies regarding utilities and cogenerators. Accordingly, the district court found that FPL had satisfied the first prong of the *Midcal* test, except as to its Strategic Energy Business Study or SEBS. *See supra* n. 14.

We agree with the district court that Florida has an obvious and clearly articulated policy to displace competition with regulation in the area of power generation and transmission and that FPL's conduct has been performed pursuant to that policy. The Florida legislature gave the PSC broad authority to regulate FPL. *See* Ch. 366, Fla.Stat. Further, the relationship between Florida utilities and cogenerators has been subject to pervasive state regulation through statute and regulatory rules. Fla.Stat. § 366.05(1), .04(1), (5), .06(1), .051 (1994); Fla.Admin.Code R. 25-

17.080-.091 (1988). A myriad of agency proceedings have transpired.[23] The field has not been left to the parties' unfettered business discretion. In addition, the Florida Supreme Court has been active in its role of judicial review. *See C.F. Industries, Inc. v. Nichols,* 536 So.2d 234 (Fla.1988) (standby rates for qualifying facilities); *PW Ventures, Inc. v. Nichols,* 533 So.2d 281 (Fla.1988) (third-party sales by qualifying facilities); *Storey v. Mayo,* 217 So.2d 304, 307 (Fla.1968), *cert. denied,* 395 U.S. 909, 89 S.Ct. 1751, 23 L.Ed.2d 222 (1969) ("The powers of the Commission over ... privately-owned utilities [are] omnipotent within the confines of the statute and the limits of organic law.").

We disagree, however, with the district court's exclusion of SEBS from its finding. It is clear that Florida intended to displace competition in the utility industry with a regulatory structure, *Southern Motor Carriers,* 471 U.S. at 64, 105 S.Ct. at 1730, and FPL's internal SEBS study has no relevance to the issue of Florida's clearly articulated policy of regulation. Contrary to the district court's ruling, we conclude that the first prong of the state action defense is satisfied here, without qualification, that is, including SEBS.[24]

---

[23]The summary judgment record includes more than fifty PSC orders dealing with issues germane to the utility/cogenerator relationship.

[24]SEBS examine alternatives in preparing for the future and provide, for example, a good business plan for the possibility that interest rates may fall, or the population growth rate of Florida may rise. When FPL has finished its good business planning, the *reaction* it takes to this planning will then be subject to state regulation. If the end product of the SEBS is illegal, the conduct will be struck down when the action is taken

2. *Conduct Actively Supervised by the State.*

This second prong of the state action defense applies when the challenged conduct is by a private party rather than a government official. *Ticor,* 504 U.S. at 630, 112 S.Ct. at 2175. Active state involvement is the second precondition for antitrust immunity; the conduct by the private party has to be closely supervised by the state. *Midcal,* 445 U.S. at 105-06, 100 S.Ct. at 943-44. The active supervision requirement is designed to ensure that the state has "ultimate control" over the private party's conduct, with the power to review and disapprove, if necessary, particular anticompetitive acts that may offend state policy. *Patrick v. Burget,* 486 U.S. 94, 101, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988).

The district court considered FPL's conduct in three areas alleged to be anticompetitive by the Cogenerators: (1) FPL's refusal to wheel; (2) its use of rates; and (3) its alleged interference with interconnection. It determined that for FPL to meet the second prong of the state action defense, Florida, through the PSC, must have "actively supervised, substantially reviewed, or independently exercised judgment and control" over FPL's "overall anti-competitive campaign."

In each of the three areas, the district court found that, while the PSC had the *power* to review FPL's conduct, it was not given the *opportunity to exercise its power* to review FPL's conduct. Therefore, the district court determined that the PSC's

---

or proposed to the PSC. *See City of Columbia,* 499 U.S. at 376-77, 111 S.Ct. at 1352.

regulatory authority (in application or as applied) did not satisfy the second prong of the state action immunity standard.

As we conclude that the PSC *did* in fact exercise active supervision over FPL, we do not discuss these areas separately, as the same rationale applies to each.

3. *The Active Supervision in this Case.*

In 1987, the PSC denied Dade's petition to allow the Cogenerators to wheel power to Hospital because they could not satisfy the PSC self-service wheeling rules. *In re: Petition of Metropolitan Date County,* Order No. 17510 (1987).[25]

The district court notes that FPL stands behind this PSC ruling as conclusive evidence of active state supervision. The district court finds this reliance misplaced. It focuses instead on the circumstances leading up to the PSC hearing: FPL's acts that have their genesis in the embryonic stages of Center when FPL participated in the early negotiations of the Cogenerator-Dade agreement. That is, under an estoppel-like analysis, the district court found that, when FPL ostensibly gave its blessing to the contract (with full knowledge that it contemplated: (1) the wheeling of excess power by FPL to other Dade locations; (2) the conveyance of power to other Dade facilities through a direct transmission line; or (3) the sale of excess power to FPL at avoided cost rates), it can't be heard to complain now. The district court's determination is based, not on whether the PSC had

---

[25]As Dade did not own the generating equipment, there was not an exact identity of ownership between the generator of the electricity on the one hand, and the ultimate consumer of the electricity, on the other. Fla.Admin.Code, Rule 25-17.0882; *PW Nichols,* 533 So.2d at 281.

the power to actively supervise and review FPL's conduct, but on whether it was ever given the opportunity to exercise its power to supervise and review (and possibly disapprove), these early acts of FPL.[26]

That is not the issue. The issue is this: Has the State of Florida, through its state regulatory agency, the PSC, actively supervised FPL in the areas of wheeling, rates and interconnection? The answer is clearly yes, as to each. The fact that FPL didn't complain about wheeling or rates or interconnection when it first reviewed the Center contract is not material as to whether or not the PSC had the power to actively supervise FPL. That power is insulated. FPL's failure to object does not take away from the PSC its opportunity to exercise the power of active supervision. Failure by the parties to commence an action or proceeding (at the time when the district court apparently thought they should have objected), does not constitute the nullification of the PSC's power to act.

The PSC exercises its powers only when called upon to do so. No call was made. For example, the decisions of this circuit govern or control a plethora of legal issues—but if a particular issue is never brought before us—it doesn't mean we don't have control. We don't have opportunity—but we still have control. We still have active supervision.

---

[26]It is clear that the district court is pondering why FPL was not heard to complain, from a legal standpoint, about this cogeneration project when it was on the drawing board. We, too, have wondered in amazement as to how this project, structured as it was, made it this far. We can do no more than ponder, however, as that is not the question before us.

The record is clear—the doors to the PSC were open to all with standing to complain.  Being met with a complaint, the PSC had the full power to actively supervise.  Whether or not the State, through the PSC, exercises its control *sua sponte* is not material, unless, of course, there is an apparent devious design to abdicate or obstruct control, and that is not the case here.  The record shows that, when the PSC was called upon, they acted.  We, the judiciary, do not have to take a walk with the PSC members to see if they visit FPL's offices every morning.

In sum, Florida has clearly articulated policies regarding the relationship between FPL and the Cogenerators.  In addition, the record is clear that the PSC actively supervised all aspects of FPL's alleged anti-competitive conduct.  We conclude, therefore, that both prongs of the state action immunity doctrine are satisfied here and FPL's conduct is immune from antitrust liability in each of the three areas of wheeling, rates and interconnection.

C. The *Noerr/Pennington* Doctrine of Immunity

*Noerr/Pennington* follows naturally from the state action doctrine.  While the state action doctrine protects private actions authorized by the state, the *Noerr/Pennington* doctrine protects private efforts to influence government officials in creating or implementing legislation that has anticompetitive effects.  This so-called political action doctrine protects First Amendment rights to assemble and petition government.  It springs less from the traditional power of the sovereign than from the rights of

individuals to petition the sovereign.[27]

In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Supreme Court held that concerted efforts to restrain or monopolize trade by petitioning government officials are protected from antitrust liability under the Sherman Act. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).[28] The litigation in *Noerr* grew out of an "economic life or death" struggle between railroads and the trucking industry for the lucrative long-distance hauling of heavy freight. *Noerr,* 365 U.S. at 129, 81 S.Ct. at 525. The truckers alleged that the railroads were behind a publicity campaign designed to procure legislation that would hurt the trucking industry. *Id.* The *Noerr* Court found that attempts by the railroads to secure the passage and enforcement of anticompetitive

---

[27]There are two main differences between the state action doctrine and the *Noerr/Pennington* doctrine. When the government chooses to displace competition without being petitioned to do so by private parties, state action applies but *Noerr/Pennington* does not. When private parties petition the government to displace competition, but the government refuses to take such action, *Noerr/Pennington* applies but state action does not. Matthew R. Gutwein, *The Commercial Exception: A Necessary Limitation to the Noerr-Pennington Doctrine,* 63 Ind.L.J. 401, 411 n. 68 (1987); *see generally* Daniel R. Fischel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine,* 45 U.Chi.L.Rev. 80, 82-88 (1977); (first name) Calkins, *Developments in Antitrust and the First Amendment: The Disaggregation of Noerr,* 57 Antitrust L.J. 327 (1988).

[28]In *California Motor Transport,* the Supreme Court extended *Noerr* to attempts to petition administrative agencies and the judiciary but limited *Noerr* protection in actions designed to deny plaintiffs access to the courts and administrative agencies. 404 U.S. at 511-12, 92 S.Ct. at 612-13.

laws cannot form the basis for antitrust liability regardless of any injury to truckers:

> It is inevitable, whenever an attempt is made to influence legislation by a campaign of publicity, that an incidental effect of that campaign may be the infliction of some direct injury upon the interests of the party against whom the campaign is directed.... To hold that the knowing infliction of such injury renders the campaign itself illegal would thus be tantamount to outlawing all such campaigns.

*Id.* at 143-44, 81 S.Ct. at 532-33.[29]

The Supreme Court gave two reasons for its decision. First, to the extent that state government has the power to restrain trade, a contrary holding would be in direct conflict with the state action doctrine. *Id.* at 137 and n. 17, 81 S.Ct. at 529 and n. 17. Second, allowing such conduct to establish Sherman Act liability might substantially impair First Amendment rights to assemble and to petition the government. *Id.* at 137-38, 81 S.Ct. at 529-30.

When the Supreme Court decided *Pennington* four years later, it expanded *Noerr* to include efforts to petition the executive branch and broadened the scope of protected behavior. 381 U.S. at 669, 85 S.Ct. at 1593. The *Noerr* doctrine, said the *Pennington* Court, "shields from the Sherman Act a concerted effort to influence public officials *regardless of intent or purpose.*" *Id.* at 670, 85 S.Ct. at 1593 (emphasis added). Furthermore, the Court

---

[29]Private action that is a sham (not genuinely aimed at procuring favorable government action) is not protected, regardless of the forum. *Noerr,* 365 U.S. at 144, 81 S.Ct. at 533 ("There may be situations in which a publicity campaign, ostensibly directed toward governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified.").

held that "[j]oint efforts to influence public officials do not violate the antitrust laws *even though intended to eliminate competition.* Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Id.* (emphasis added). This immunity doctrine extends to the lobbying of local legislators. *City of Columbia,* 499 U.S. at 379-84, 111 S.Ct. at 1353-56. "[T]hat a private party's political motives are selfish is irrelevant: '*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.' " *Id.* at 380, 111 S.Ct. at 1354, quoting *Pennington,* 381 U.S. at 670, 85 S.Ct. at 1593.[30]

In *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988), the Supreme Court began to differentiate between degrees of antitrust immunity for acts of petitioning the government.[31] It noted that the scope of

---

[30]*See also McGuire Oil Co. v. Mapco, Inc.,* 958 F.2d 1552, 1560 (11th Cir.1992) ("[I]t is axiomatic that actions taken with an anti-competitive purpose *or intent* remain insulated from antitrust liability under the *Noerr-Pennington* doctrine.") (emphasis added).

[31]*Allied Tube* involved the National Fire Protection Association, a private standard-setting organization. It set product standards and published fire protection codes that were routinely adopted into law by state and local government. The code permitted electrical conduits made of steel but not of plastic. A plastics manufacturer proposed the adoption of plastic conduits into the code as well. The proposal was approved in committee. It could then be adopted by a simple majority of association members at their annual meeting. Before the vote, the nation's largest steel producer packed the annual meeting with sympathetic no-voting members and the plastics proposal was defeated. A jury found the steel manufacturer liable for its actions. The district court granted a judgment notwithstanding the verdict, reasoning that the steel manufacturer was entitled to antitrust immunity under *Noerr.* The Second Circuit reversed, refusing to extend *Noerr* immunity and the Supreme Court agreed. *Id.*

the protection depends upon the source, context, and nature of the anticompetitive restraint at issue. *Id.* at 499, 108 S.Ct. at 1936. Absolute immunity from antitrust liability results where the restraint upon trade or monopolization is the result of valid governmental action as opposed to private action. *Id.* Further, where, independent of any government action, the anticompetitive restraint results directly from private action, the restraint cannot form the basis for antitrust liability if it is "incidental" to a valid effort to influence governmental action. *Id.*

The Court found that Allied's efforts were not immune from liability because they were essentially commercial in nature and their political aspects were secondary.[32] It stated that "[w]hat distinguishes this case from *Noerr* and its progeny is that the context and nature of petitioner's activity make it the type of commercial activity that has traditionally had its validity determined by the antitrust laws themselves." *Id.* at 505, 108 S.Ct. at 1939.

Citing *Allied Tube, Todorov v. DCH Healthcare Authority,* 921 F.2d 1438 (11th Cir.1991) and *Hill Aircraft & Leasing Corp. v. Fulton County,* 561 F.Supp. 667 (N.D.Ga.1982), *aff'd,* 729 F.2d 1467 (11th Cir.1984), the district court in this case found that when FPL lobbied the Commission to vote against construction of the

---

[32] "[W]e think that, given the context and nature of the conduct, it can more aptly be characterized as commercial activity with a political impact. Just as the antitrust laws should not regulate political activities "simply because those activities have a commercial impact," [*Noerr,*] 365 U.S. at 141, 81 S.Ct. at 531, so the antitrust laws should not necessarily immunize what are in essence commercial activities simply because they have a political impact." 486 U.S. at 507, 108 S.Ct. at 1940.

Center-to-Hospital transmission line, its conduct fell within the so-called commercial exception to *Noerr* because FPL didn't want to lose Hospital as a valued customer. The district court reasoned that FPL's legislative lobbying was not for political reasons but for economic reasons; it violated state policies as it was in direct contravention to Florida's policies promoting cogeneration; it was aimed at a commercial purchasing decision by Dade; and it was not a political or "policy" decision but a commercial or pecuniary one. The district court also found that FPL's participation in the negotiation of the Cogenerator-Dade contract was not protected by *Noerr* immunity.[33]

We conclude that the district court's reliance in this case on *Allied Tube, Todorov* and *Hill Aircraft* to formulate a commercial exception to *Noerr/Pennington* as the law of this circuit is misplaced. The district court has misread *Allied Tube* and extended it in an inappropriate way; in addition, neither *Todorov*[34] nor *Hill Aircraft*[35] expressly discuss *Noerr* in more than *dicta.*

---

[33]The district court accepted the *Noerr* defense, however, with respect to FPL's lobbying of the PSC to deny the Cogenerators' self-service wheeling claim, apparently on the basis that the Cogenerators had conceded that FPL's lobbying efforts during the PSC hearings were immune from antitrust liability.

[34]*Todorov* is distinguishable as it did not involve legislative lobbying but rather the lobbying of a hospital peer group committee. Furthermore, the *Todorov* panel limited its discussion of *Noerr* to a footnote, 921 F.2d at 1446 n. 14, declined to rule on the *Noerr* issue, and affirmed the district court on other grounds, *id.*

[35]The district court decision in *Hill Aircraft* was affirmed by this court without discussion. Moreover, the district court in *Hill Aircraft* expressly distinguished the facts before it from those involving legislative lobbying. 561 F.Supp. at 675.

*Allied Tube* involved a private standard-setting association and not a governmental entity or legislative body. And, while it is true that the fire code standards in *Allied Tube* were routinely adopted into law by a substantial number of state and local governments, that does not transform the private association into a legislative body or even a "quasi-legislative" body. In addition, *Allied Tube* did not involve any governmental lobbying. While it is true under *Allied Tube* that one must look not only to the activity's "impact, but also [to] the context and nature of the activity," Order at 44, quoting 486 U.S. at 504, 108 S.Ct. at 1939, the Supreme Court continues on to state that "[lobbying] in the open political arena, where partisanship is the hallmark of decisionmaking," is immune, whereas lobbying "within the confines of a private [i.e., non-governmental] standard-setting process" may not be immune. *Id.*[36]

The Supreme Court and this circuit have never expressly considered the validity of what has been referred to as the commercial exception to the *Noerr/Pennington* doctrine and we are not required to do so now. We conclude that FPL's conduct is protected under *Noerr/Pennington* and does not fall under any exception, commercial or otherwise. The district court's rejection of *Noerr/Pennington* immunity because of a perceived commercial exception was in error.

Second, FPL has a constitutional right to petition its

_____

[36]*Allied Tube* actually supports FPL's position, that is, they were immune from antitrust liability when they lobbied Commission, an "open political arena," or Dade's legislative body.

governing legislative bodies. FPL lobbied Commission to vote *against* constructing the separate transmission line; the Cogenerators lobbied Commission to vote *for* construction. FPL's motivation to speak out against building the line is irrelevant.[37] It is obvious that FPL had a self-interest in protecting its energy customer base; to lose Hospital as a customer would have cost FPL thousands of dollars a year in lost revenues. The fact that this lobbying was in FPL's commercial best interest is beside the point. *City of Columbia,* 499 U.S. at 380, 111 S.Ct. at 1354 (that a private party's political motives are selfish is irrelevant).

The district court found it significant that FPL lobbied a legislative body for a specific purpose—construction of a transmission line—rather than passage of favorable legislation in general. That is not significant. The First Amendment protections of *Noerr* do not turn on whether one petitions for governmental action in general or for specific legislative action. Legislative lobbying is protected, "either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Pennington,* 381 U.S. at 670, 85 S.Ct. at 1593; *see also City of Columbia,* 499 U.S. at 381, 111 S.Ct. at 1354.

In sum, we look to the conduct, not the intent or motivation behind the conduct. The fact that FPL had a pecuniary interest in the outcome of the lobbying or that the lobbying was for a specific purpose does not matter, it merely begs the question. And, suffice

---

[37]In reality, FPL *should be expected* to speak out; otherwise, the PSC could find that FPL wasn't protecting its energy customer base, and, subject FPL to serious penalty if, as a result, electric rates to consumers were driven up.

it to say that a circumstance might one day present itself that could amount to conduct not protected under *Noerr/Pennington* as some sort of commercial exception. That is not the case here. We conclude that FPL's conduct in lobbying the Commission against the construction of a separate transmission line is constitutionally protected under the *Noerr/Pennington* doctrine of immunity.

## V. CONCLUSION

For the reasons stated above, under both the state-action and the *Noerr/Pennington* immunity doctrines, we conclude that FPL's conduct concerning the Cogenerators is immune from antitrust liability in each of the areas of wheeling, rates, interconnection, and lobbying. We reverse the district court's denial of FPL's motion for summary judgment in these four areas. As this ruling does not entirely resolve the dispute before us, however, we leave all remaining issues for determination upon remand.

The decision of the district court is reversed. The case is remanded for further proceedings consistent with this opinion.

REVERSED and REMANDED.