WE, INC. t/a University Coin Laundry, et al., Plaintiffs,

v.

CITY OF PHILADELPHIA DEPARTMENT OF LICENSES AND INSPECTIONS, et al., Defendants.

No. CIV. A. 97–2874.

United States District Court, E.D. Pennsylvania.

Nov. 17, 1997.

Stephanie Resnick, Ronald J. Shaffer, Gregory B. Williams, Fox, Rothschild, O'Brien & Frankel, LLP, Philadelphia, PA, for We, Inc., William Schoepe, Jr.

Francine Friedman Griesing, Cureley Antell Cole, City of Philadelphia, Law Department, Philadelphia, PA, for City of Department of Licenses and Inspections, Rudolph M. Paliaga.

Roger F. Cox, Robert A. Burke, Blank Rome Comisky & McCauley, Philadelphia, PA, for University of Pennsylvania, Maureen Rush.

Cureley Antell Cole, Blank Rome Comisky & McCauley, Philadelphia, PA, for City of Philadelphia, et al.

### ORDER and MEMORANDUM

KATZ, District Judge.

AND NOW, this 17th day of November, 1997, upon consideration of defendants Trustees of the University of Pennsylvania and Maureen S. Rush's Motion to Clarify the Court's October 22, 1997 Order Relating to the Noerr–Pennington Defense, and the response and the reply thereto, it is hereby **ORDERED** that, treating said motion as one for reconsideration, the motion is **DENIED.**

*Factual and Procedural Background*

This case arises out of the closing of plaintiffs' businesses by the issuance and execution of a Cease Operations Order (the "Order") by the City of Philadelphia Department of Licenses and Inspections ("L & I") on April 18, 1997. The businesses, a laundromat and an arcade, are located on the 4000 block of Spruce Street in Philadelphia, on the border of the campus of the University of Pennsylvania (the "University" or "Penn").

In the months leading up to the issuance of the Order, the University had complained to the City repeatedly and urged the City to take action regarding plaintiffs' businesses, which they considered to be a nuisance and a threat to the safety of students and other members of the University community.[1] The University actively participated in a campaign to shut down the businesses. They met with the plaintiffs themselves and communicated, directly and through their attorney, with L & I and the District Attorney's Public Nuisance Task Force.

During this time period, L & I conducted zoning, license, and fire code inspections of the businesses and, with the exception of two fire code violations which were promptly cured, they were in compliance, with the last inspection taking place on April 1, 1997. *See* Pl. S.J. Mot. Ex. E at 45 (Paliaga deposition). On April 9, Carl Anderson of the Public Nuisance Task Force supplied Gerald Richards of L & I with "numerous police incident reports regarding disorderly and nuisance conduct" at the businesses' location, along with a request that he represented to be from the University, and which he said was joined by his office, to issue a Cease Operations Order. *See* Pl. S.J. Mot. Ex. I (memo

and incident reports). Although Richards advised the Director of business Regulatory Enforcement, Rudolph Paliaga, that he did not believe there was a sufficient basis for revoking the license without a hearing, Mr. Paliaga had "determined in [his] own mind that this property was a public nuisance," Pl. S.J. Mot. Ex. E at 59, and he issued the order.

When L & I issued the Order, they contacted the University Police, and the head of University Police, defendant Maureen Rush, and at least one uniformed University Police officer, Lieutenant Gerald Leddy, were present with the L & I representative, Gary Adams, at the businesses when he executed the Order, a role that is usually filled by a member of the Philadelphia Police Department.[2] While in the businesses with Adams, at Adams' request Rush and Leddy instructed patrons to leave. *See* Pl. S.J. Mot. Ex. C at 257–58 (Rush deposition); Pl S.J. Resp. Ex. D at 35–39 (Leddy deposition).

The present action was brought by plaintiffs against the City of Philadelphia Department of Licenses and Inspections and its Director of Business Regulatory Enforcement, Rudolph M. Paliaga, as well as the University defendants who bring the instant motion. After plaintiffs filed a motion for a temporary restraining order, all parties signed a stipulation that revoked the Cease Operations Order and allowed the businesses to reopen on the condition that precautions be taken to guard against curfew violations. *See* Def. S.J. Mot. Ex. J. The City defendants have settled the claims against them. The University defendants remain in the case and have cross-claimed for public and private nuisances. Both plaintiffs and defendants

---

1. Plaintiffs also assert that Penn was motivated by a desire to force plaintiffs to sell the businesses to the University, and they have adduced some evidence that Penn did express an interest in purchasing the property. *See* Pl. S.J. Mot. Exs. D, H (depositions of John Fry and Scott Lederman).

2. Mr. Adams' deposition testimony is unclear on this point: When asked if he understood the Penn officers to be acting in the capacity normally filled by the Philadelphia police, he answered, "No." Def. S.J. Mot. Ex. I at 56. But a short time later, when asked why he gave a copy of the Order to Ms. Rush, he answered, "Because I

thought she was a Philadelphia police officer." *Id.* at 60. In any event, given Ms. Rush's explanation that she was there as "backup" and to ensure Mr. Adams' safety, *see* Pl. S.J. Mot. Ex. C. at 257, and Mr. Adams' request that Rush and Leddy help him clear out patrons, *see id.* at 258, it is clear they understood the University police to be present in some official capacity. Members of the Philadelphia Police Department, who usually accompany L & I Inspectors to issue Cease Operations Orders, did arrive several minutes after the University officers and Adams entered the premises.

moved for summary judgment, and the court denied both motions.

*Discussion*

Defendants' claim for *Noerr–Pennington* immunity is denied, because the University defendants' conduct arguably went beyond the mere "petitioning" of government that the *Noerr–Pennington* doctrine is designed to protect.

■ The *Noerr–Pennington* doctrine originated in the antitrust context as the proposition that competitors' collective use of legislative, administrative, or judicial process does not by itself constitute a Sherman Act violation. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *California Motor Transp. v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972). The Third Circuit, along with other courts, has by analogy extended the doctrine's reasoning to offer protection to conduct in other areas.[3] In *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155 (3d Cir.1988), the Third Circuit upheld the dismissal of charges of civil conspiracy and tortious interference with business relations against private individuals and state officials who worked publicly to shut down a nursing home. The court said, "There can be no tortious action or impropriety when private citizens or public officials exercise their rights to notify the appropriate agencies or mobilize public opinion about a serious violation of the law." *Id.* at 159.

■ The defendants' conduct in the present case can be distinguished from that of the defendants in *Brownsville*. In that case, the defendants' conduct can fairly be characterized as complaining, albeit vigorously, to the proper authorities and then leaving it to those authorities to take the appropriate measures. As the court there put it, the conduct in question amounted to "calling [the defendant's] violations to the attention of state and federal authorities and eliciting public interest." 839 F.2d at 160. In *Brownsville*, the private individuals engaged in a "herculean" letter-writing campaign to government officials and the media. *See* 839 F.2d at 158. Plaintiffs' contention there was that, along with the letter-writing campaign (which was aggressive and successful enough to result in a segment about the nursing home's conditions airing on a nationally televised network television program), the Senator who chaired the Committee on Aging pressured state and federal regulators into decertifying the nursing home. Writing letters to political representatives and to media organizations are activities that are paradigmatic examples of traditional forms of petitioning government that are necessary and desirable in our country's democratic and representative political system, and thus well within the category of conduct the *Noerr–Pennington* doctrine is designed to immunize. *See Noerr*, 365 U.S. at 137, 81 S.Ct. at 529 ("[T]he whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that people cannot freely inform the government of their wishes would … be particularly unjustified.").

■ In the instant case, though, the crux of plaintiffs' complaint is that the University went beyond merely complaining or petitioning the government: plaintiffs claim that defendants were integrally involved in not only initiating (or publicizing or vocalizing or rallying public support around) a complaint, but in, among other things, carrying out the Cease Operations order that L & I issued to plaintiffs' businesses. As set forth in the

---

3. The *Noerr–Pennington* doctrine was developed to deal with the particular problem of the statutory mandate of the Sherman Act coming in direct conflict with First Amendment freedoms, *see Noerr*, 365 U.S. at 137–38, 81 S.Ct. at 529–30; but courts, including the United States Supreme Court, have recognized that its basic premise of protecting petitioning activities by citizens applies equally in contexts other than antitrust. *See, e.g., NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); *Video Int'l Prod., Inc. v. Warner–Amex Cable Communications, Inc.*, 858 F.2d 1075 (5th Cir.1988); *Evers v. County of Custer*, 745 F.2d 1196, 1204 (9th Cir.1984); *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607 (8th Cir.1980).

facts above, University police officers were present at the time the L & I representative executed the Cease Operations Order, and they directed patrons to leave because the businesses were being shut down. There is no petitioning element to this activity. As plaintiffs put it, "Here the University defendants went far beyond 'making their wishes known to their government.'" Pl. S.J. Resp. Memo. at 14. The official presence of a University police officer at the posting and execution of the Cease Operations Order went beyond mere petitioning, and thus there is genuine issue of material fact as to whether the University's course of conduct as a whole went beyond First Amendment protected activity.