**BRISTOL–MYERS SQUIBB COMPANY, Plaintiff,**

v.

**IVAX CORPORATION and Zenith Goldline:Pharmaceuticals, Inc., Defendants.**

**Civ. No. 98–1412.**

United States District Court, D. New Jersey.

Jan. 4, 2000.

---

William L. Mentlik, Arnold H. Krumholz, Paul H. Kochanski, Michael H. Teschner, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, NJ, Gerson A. Zweifach, Sharon L. Davis, Williams & Connolly, Washington, DC, Jay B. Shapiro, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A., Miami, FL, for Defendant IVAX Corp., Defendant–Counterclaim Plaintiff Zenith Goldline Pharmaceuticals, Inc., and Counterclaim Plaintiff Baker Norton Pharmaceuticals, Inc.

William J. O'Shaughnessy, McCarter & English, Newark, NJ, Robert L. Baechtold, Fitzpatrick, Cella, Harper & Scinto, New York City, Evan R. Chesler, Cravath, Swaine & Moore, New York City, for Plaintiff and Counterclaim Defendant Bristol–Myers Squibb Co.

1. In its original complaint, Bristol sued to protect three patents, including one owned by the United States Department of Health and Human Services and licensed exclusively to

## OPINION

WALLS, District Judge.

### INTRODUCTION

Bristol–Myers Squibb ("Bristol"), a drug manufacturer, has sued Zenith Goldline and IVAX Corporation for infringement of two patents [1] owned by Bristol that claim methods of using the anti-cancer drug Taxol®, a drug based on a natural agent known as paclitaxel. The plaintiff alleges that Zenith Goldline, with the assistance of IVAX, has filed Abbreviated New Drug Application ("ANDA") 75–297 with the Food and Drug Administration, to request approval to market paclitaxel. Bristol claims that the filing of the ANDA constitutes infringement of Bristol's rights under U.S. Patent No. 5,641,803 ("the '803 patent") and No. 5,670,537 ("the '537 patent"), pursuant to the Hatch–Waxman Act, 35 U.S.C. § 271(e)(2)(A).

Zenith Goldline and Baker Norton (a subsidiary of IVAX Corporation) assert numerous counterclaims based on federal antitrust provisions and state law. The counterclaimants name causes of action for unfair competition (Count I), estoppel (Count II) and violations of the Sherman Act, 15 U.S.C. § 2 (Counts III and IV), and seek declaratory judgment (Count V).

Bristol now moves pursuant to Fed. R.Civ.P. 12(b)(6) to dismiss all counterclaims of Baker Norton, and the estoppel claim (Count II) of Zenith Goldline. Bristol also moves to dismiss Zenith Goldline's counterclaims to the extent that they relate to allegations of conduct immunized by the Noerr–Pennington doctrine (portions of Counts I, II, III, and IV), and to strike such portions of the pleadings pursuant to Fed.R.Civ.P. 12(f).

These motions, decided without oral argument pursuant to Fed.R.Civ.P. 78, are granted.

Bristol. This U.S. Patent No. 5,496,804 ("the '804 patent"), known as the Reed patent, was later withdrawn from this case by agreement of the parties.

## BACKGROUND

Paclitaxel is the FDA-designated generic term for an anti-cancer agent derived from the bark of the Pacific Yew tree. Its anti-cancer properties were discovered and developed by researchers at the National Cancer Institute ("NCI"), an institute of the National Institutes of Health ("NIH"), beginning in the 1960's. During this period, the federal government developed techniques to extract paclitaxel from yew tree bark and to create a clinically acceptable formulation for treating humans.

In the early 1980's, the NCI conducted research and clinical trials concerning the use of paclitaxel to treat ovarian cancer. Eventually, the agency sought a commercial partner to bring a paclitaxel-based drug to market, and in 1991 the NCI and Bristol entered into a Cooperative Research and Development Agreement ("CRADA") pursuant to the Federal Technology Transfer Act, 15 U.S.C. § 3710a(b).

In 1991 and 1993, Congress held investigatory hearings to determine the extent of Bristol's power to exclude competition pursuant to the CRADA, and to examine Bristol's pricing arrangements. Bristol made various oral and written statements during these hearings.

Beginning in 1991, purportedly relying on public assurances by Bristol not to block competition in the development of paclitaxel-related drugs, Baker Norton began to conduct clinical trials involving the use of paclitaxel to treat breast cancer. In 1995, Baker Norton learned that the NCI had obtained U.S. Patent No. 5,496,846 ("the '846 patent"), known as the Wilson patent, which described the use of paclitaxel to treat breast cancer. Accordingly, Baker Norton sought a nonexclusive license to this patent in the spring of 1996 and formally applied to the NIH in September 1996. Soon after, NIH informed Baker Norton that no license was available because the agency had determined that the Wilson patent was a subject invention of the CRADA. And because Bristol had exercised its option under the CRADA for an exclusive license to this patent, Baker Norton's application was rejected. Countercl. ¶¶ 45–60.

Baker Norton, seeking to market a paclitaxel-based drug to treat Kaposi's sarcoma, a life-threatening form of cancer that often strikes persons with AIDS, developed and tested Paxene®, a paclitaxel-based drug. The counterclaimants allege that through Baker Norton's application to the NIH for a license to the Wilson patent, Bristol improperly learned that Baker Norton was preparing a New Drug Application to obtain "orphan drug" exclusive marketing privileges regarding the treatment of Kaposi's sarcoma. Countercl. ¶¶ 83–84. Orphan drug designation is a form of non-patent marketing exclusivity granted by the FDA pursuant to 21 U.S.C. § 360bb to encourage the development of drugs to treat rare diseases or conditions. The counterclaimants allege that in February 1997, with the assistance of data from NCI researchers, Bristol submitted to the FDA its own application for orphan drug status and a supplemental New Drug Application. Countercl. ¶ 89. These applications were approved, and Bristol was granted a seven-year period of marketing exclusivity. As a result, Baker Norton's New Drug Application, submitted in March 1997, was approved, but Baker Norton was barred from marketing Paxene® to treat patients with Kaposi's sarcoma until 2004. Countercl. ¶¶ 92–93.

## ANALYSIS

### I. Standard for a Motion to Dismiss

On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6), the court is required to accept as true all allegations in the counterclaims, and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving parties. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3rd Cir.1994). The question is whether the claimants can prove any set of facts consistent with their allegations that will entitle them to relief, not whether they will ultimately prevail. *Hishon v. King &*

*Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). While a court will accept well-pleaded allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegation. *See Miree v. DeKalb County, Ga.,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977). The Court may consider the allegations of the pleadings, as well as documents attached or specifically referenced thereto, and matters of public record. *See Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 259 (3rd Cir. 1998); *see also* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 at 299 (2nd ed.1990).

## II. The Noerr–Pennington Doctrine

Bristol moves to dismiss certain allegations of the counterclaims for state law unfair competition (Count I), monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count III), and attempted monopolization (Count IV). As the counterclaim defendant, Bristol maintains that because any injury to Baker Norton was the result of Bristol's valid efforts to obtain government action, such efforts are immunized from federal antitrust and state law liability by the Noerr–Pennington doctrine.

According to Bristol, Zenith Goldline does not have standing to assert counterclaim allegations that Bristol carried out a "scheme" to monopolize profits from paclitaxel-based drugs: The relevant counterclaims assert in part that Bristol interfered with Baker Norton's ability to obtain a license to the Wilson patent and secure immediate FDA approval to market paclitaxel. Admittedly, these allegations do not concern Zenith Goldline. However, the counterclaimants also allege that Bristol obtained patents by fraud and inequitable conduct, illegally obtained exclusive patent licenses and is currently asserting invalid patents to the detriment of Zenith Goldline. The court cannot readily disentangle the respective counterclaims of Baker Norton and Zenith Goldline. Because Bristol

has made no other arguments concerning the standing issue, the court treats these counterclaims as they were asserted, that is, by both counterclaimants.

The Supreme Court in *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), ruled that federal antitrust liability did not arise from a publicity campaign by railroad companies directed toward obtaining legislation favorable to railroads and destructive of the business interests of competitor trucking companies. The Court held that such a result was necessary to protect the First Amendment right to petition the government. It reasoned that such actions are "not business activity, but political activity," and found that while violations of the Sherman Act typically involve "express or implied agreement or understanding that the participants will give up their trade freedom, or help one another to take away the trade freedom of others through the use of such devices as price-fixing agreements, boycotts, market-division agreements, and other similar arrangements," "where a restraint upon trade or monopolization is the result of valid government action, as opposed to private action, no violation of the Act can be made out." *Id.* at 136, 81 S.Ct. 523.

The *Noerr* Court countenanced only one exception to immunity: "There may be situations in which a publicity campaign, ostensibly directed toward influencing government action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Id.* at 144, 81 S.Ct. 523.

The principles of *Noerr* and its companion, *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), have since been extended to provide immunity to private efforts to influence courts, federal and state agencies. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S.

508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

The counterclaimants protest that this doctrine does not immunize an entire course of wrongful acts simply because Bristol requested government approval and licenses as part of its allegedly tortious scheme. They rely on *Allied Tube & Conduit Corp. v. Indian Head, Inc.* that the scope of antitrust protection depends on the "source, context, and nature of the anticompetitive restraint at issue." 486 U.S. 492, 499, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988) (holding that anticompetitive actions of private standard-setting body could not be considered either valid governmental action or "incidental" to a valid effort to influence government action, and thus were subject to antitrust scrutiny). "An anticompetitive, private tortious scheme is not transformed into protected 'political' activity simply because a defendant submits an application to a government agency for approval or authorization." Opp. Br. at 14; *see Ticor Title Ins. Co. v. F.T.C.,* 998 F.2d 1129 (3rd Cir.1993) (refusing to permit immunity where title insurance companies agreed collectively to set uniform rates, though rates were subject to approval by state-chartered rating bureaus; holding that "a state's rubber stamp is not enough" to immunize private actions); *Litton Systems v. American Tel. and Tel. Co.,* 700 F.2d 785, 804–809 (2nd Cir.1983) (rejecting NoerrPennington doctrine as inapposite where telecommunications carrier had filed its rates in a tariff with a federal agency because "[t]he fact that the FCC might ultimately set aside a tariff filing does not transform AT & T's independent decisions as to how it will conduct its business into a 'request' for governmental action or an 'expression' of political opinion.")

## A. Sherman Act Counterclaims

■ Baker Norton and Zenith Goldline plead two counterclaims for violations of the Sherman Act. They allege that Bristol improperly obtained exclusive licenses to government-owned patents and secured orphan drug exclusivity privileges: (1) to block competition to market paclitaxel to breast cancer patients, Bristol contracted with NCI for an exclusive license to the Wilson patent (the '846 patent), by employing a "blatantly incorrect" interpretation of Bristol's CRADA; and (2) once it learned that Baker Norton was preparing to request FDA approval of Paxene® to treat Kaposi's sarcoma, Bristol secured FDA approval of its own supplemental NDA and request for orphan drug exclusivity, which barred Baker Norton's ability to market paclitaxel for that indication until 2004.

The counterclaimants also allege that Bristol secured patents through inequitable conduct and fraud on the Patent and Trademark Office, attempted to enforce invalid patents, and brought litigation to exclude Baker Norton and Zenith Goldline from the paclitaxel market. Bristol does not move to dismiss these *Walker Process* allegations.

### 1. Whether Bristol Engaged in Protected Petitioning Activity

Responding to Bristol's motion to dismiss, the counterclaimants contend that Bristol's conduct did not constitute protected political petitioning activity. Opp. Br. at 15 n. 10. The court does not agree. "Petitioning activity takes many forms.... Lobbying legislators or executive agency officials for advantageous changes in business laws or regulations, filing suit to enjoin an ex-employee from disseminating trade secrets, completing a questionnaire promulgated by a judicial commission rating candidates' fitness for judicial office, testifying at a zoning hearing before the county commissioners, complaining to appropriate county officials about unfit teachers or about police misconduct, and reporting violations of environmental laws or government contract fraud to federal agencies, all constitute petitioning activity." Aaron R. Gary, *First Amendment Petition Clause Immunity from Tort Suits,* 33 Idaho L.Rev. 67, 71 (1996).

The Third Circuit found protected petitioning conduct when the American Bar

Association conveyed its law school accreditation decisions to the states, which relied upon ABA standards: "[E]very state retains the final authority to set all the bar admission rules ... the states are sovereign in imposing the bar admission requirements." *Massachusetts School of Law at Andover v. American Bar Ass'n,* 107 F.3d 1026, 1035–36 (3rd Cir.1997). Our Circuit Court concluded that the state action of establishing the bar examination requirements led to the alleged injury, and that antitrust claims by an unaccredited law school against the ABA were barred by the Noerr–Pennington doctrine. Likewise, the Circuit has recently decided that the actions of physicians to oppose the application of a potential health care competitor for a "Certificate of Need" from the state Department of Health were protected from antitrust liability. Relying on the rationale of *Massachusetts School of Law,* the Court determined that the plaintiff competitor's injuries were the "direct result of the [government's] decision to deny the plaintiff's application for a [Certificate of Need]." *Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital,* 185 F.3d 154, 160 (3rd Cir. 1999). Judge Stapleton wrote that although the defendant physicians had engaged in concerted anticompetitive activity, including their announcement that they would boycott the proposed competitor, their activities were immune from the antitrust laws. *Id.* at 160.

The counterclaimants rely upon the First Circuit's *George R. Whitten, Jr. v. Paddock Pool Builders, Inc.,* 424 F.2d 25 (1st Cir.1970). There, a swimming pool contractor was sued by a competitor under the antitrust laws for its zealous efforts to sell its products to school boards and other public bodies. Upon review of the Noerr–Pennington line of authority, that Circuit Court determined that such was based on the principle that private actors should have "uninhibited access to government policy makers" when significant policy determinations were involved. In contrast, the *Whitten* Court held that the defendant's efforts to sell products to public officials acting under competitive bidding statutes did not implicate sufficient government action to justify immunity. *Id.* at 32–33.

Even were *Whitten* controlling authority, it is distinguishable from the present circumstances. Here, there is no question that the counterclaiming plaintiffs' injuries were the "direct result" of decisions made by government agencies. *See Armstrong Surgical Center,* 185 F.3d at 160. NCI chose to enter a licensing agreement with Bristol; likewise, the FDA made the decision to grant orphan drug exclusivity to the defendant drug company. These decisions cannot fairly be characterized as the result of Bristol's private actions. Moreover, the agency decisions invoked significantly more substantial policy concerns than the "technical decision about the best kind of weld to use in a swimming pool gutter" addressed in *Whitten.* 424 F.2d at 32. Counterclaimants' argument that Bristol was not engaged in protected petitioning conduct flounders.

### 2. Whether Bristol's Allegedly Tortious Conduct Defeats NoerrPennington Immunity

The counterclaimants next argue that any antitrust immunity is shed by Bristol's engagement in a course of tortious conduct. They charge that: (1) Bristol improperly received Baker Norton's confidential business information and obtained an exclusive license to the Wilson patent only after it became aware that Baker Norton had expressed interest in obtaining a nonexclusive license to use paclitaxel to treat breast cancer (Countercl.¶¶ 59, 70–78); (2) Bristol obtained its license to the Wilson patent solely to block competition, and has never attempted to bring a breast cancer therapy to market (Countercl.¶¶ 71, 78); (3) Bristol misappropriated Baker Norton's confidential business information, learned that Baker Norton was preparing to apply for orphan drug status to market paclitaxel to treat Kaposi's sarcoma and submitted its own request for orphan drug

status (Countercl.¶¶ 84, 92). Additionally, (4) while the FDA was considering Baker Norton's application for orphan drug status, Bristol met privately with high-level FDA officials in an effort to block the application (Countercl.¶ 91).[2]

By analogy to *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, Baker Norton and Zenith Goldline assert that the Noerr–Pennington doctrine does not protect misconduct in *ex parte* proceedings before a government agency. *See* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965) (holding that maintenance and enforcement of a patent obtained by fraud on the PTO can form the basis for antitrust liability). This analogy is too broad.

Even taken at face value, as required at this stage, the counterclaimants' allegations of tortious conduct are insufficient to remove Bristol's actions from the ambit of the Noerr–Pennington doctrine. To survive this motion to dismiss, the counterclaimants must have set forth sufficient information for one to infer that their allegations are supportable; they may not rely on bald assertions or legal conclusions made in the guise of factual allegations. *EP Medsystems, Inc. v. Echocath, Inc.*, 30 F.Supp.2d 726, 740 (D.N.J.1998). Here, Baker Norton and Zenith Goldline have provided the court and their adversary with no information concerning the circumstances under which Bristol purportedly obtained confidential business information. Likewise, they have failed to allege the requisite elements of any purported misrepresentation claim. *Cf.* Fed.R.Civ.P. 9(b). The counterclaimants have fallen short of the pleading standards mandated by the federal rules: this court is faced with a request to override Bristol's immunity when it is unable to discern any misconduct.

If misconduct were evident, counterclaimants' argument would remain inadequate. In reviewing a publicity campaign that involved the circulation of propaganda which had been disguised as independent commentary, the *Noerr* Court rejected the argument that unethical business conduct could form a basis for antitrust liability. The Court held that even deliberate deception of the public and public officials was of no consequence to liability under the Sherman Act. 365 U.S. at 145, 81 S.Ct. 523. Again, the Court has written that "improper or even unlawful" lobbying techniques are insufficient to defeat Noerr immunity unless the alleged injuries arise from the lobbying process itself. *Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 381, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). Recently, this Circuit has found the dissemination of false information during a lobbying campaign irrelevant to the antitrust inquiry; liability is precluded "even where it is alleged that a private party urging the action did so by bribery, deceit or other wrongful conduct that may have affected the decision making process." *See Armstrong Surgical Center*, 185 F.3d at 162.

Finally, the counterclaimants' continued reliance on *Walker Process* is off course. That case established that enforcement of a patent procured by fraud upon the Patent and Trademark Office may violate the Sherman Act. 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247. Although true *Walker Process* counterclaims remain at issue, as yet unchallenged by Bristol, the foregoing decisions make it apparent that the *Walker Process* decision cannot be read for the generalization that all forms of misconduct before a government agency vitiate Noerr–Pennington immunity. For these reasons, the court disregards the counterclaimants' allegations of Bristol's misconduct.

**2.** In their brief in opposition to this motion, the counterclaimants assert that Bristol misrepresented or fraudulently omitted information during its contacts with the NIH and the FDA. Opp. Br. at 20–21. The counterclaims make no reference to such fraud, describing only meetings between Bristol and FDA officials. Countercl. ¶ 91. The counterclaimants may not so amend their pleadings through their brief. *Town of Secaucus v. United States Dep't of Transp.*, 889 F.Supp. 779, 791 (D.N.J. 1995).

### 3. The Commercial Exception

In a final effort to save their antitrust claims, Baker Norton and Zenith Goldline proffer that when the government acts in a commercial role, rather than in its political or regulatory capacity, courts should apply a "commercial exception" to the Noerr–Pennington doctrine and reject assertions of immunity. They assert that the NCI and its parent NIH began an ongoing commercial relationship with Bristol in 1991, when NCI and Bristol entered the CRA-DA. Countercl. ¶ 31. They also allege that when NIH granted Bristol an exclusive license to the Wilson patent, the agency had been a commercial partner with Bristol for five years and was in the process of negotiating a royalty agreement under the licensing agreement. Countercl. ¶ 81.

Referring to *Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), the counterclaimants argue that the Supreme Court "has recognized the potential viability" of such a commercial exception to antitrust immunity. There, Justice Scalia applied *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), which he described as the corollary to Noerr: "the former decision protects the States' acts of governing, and the latter the citizens' participation in government.... Parker and Noerr generally present two faces of the same coin." 499 U.S. at 383, 111 S.Ct. 1344. Describing the scope of Parker immunity, the Court wrote: "We reiterate that, *with the possible market participant exception,* any action that qualifies as state action is 'ipso facto ... exempt from the operation of the antitrust laws.'" *Id.* at 379, 111 S.Ct. 1344 (emphasis added). Notably, the *Columbia* Court did not define this potential exception, and the Supreme Court has never ruled on its applicability. In turn, this Circuit recently reviewed the *Columbia* decision and explained that the "possible" market participant exception "relates to state action as a purchaser or seller in the market rather than as a sovereign regulator." *Armstrong Surgical Center v. Armstrong County,* 185 F.3d 154,

162 n. 4 (3rd Cir.1999). However, the Circuit has not ruled that Noerr–Pennington immunity can be defeated by such a commercial relationship.

The counterclaimants also rely upon a Ninth Circuit decision, *Practice Management Information Corp. v. American Medical Ass'n,* 121 F.3d 516, 521 (9th Cir. 1997), *opinion amended by* 133 F.3d 1140 (Jan. 9, 1998), which rejected, in passing, the American Medical Association's application for Noerr–Pennington immunity because its contract with a federal agency was not the result of lobbying, and did not involve the First Amendment right to petition the government. Because that case concerned copyright misuse, the Ninth Circuit gave this issue cursory treatment. Significantly, the Ninth Circuit has ruled, in the company of the Eleventh and Fifth Circuits, that a so-called commercial exception to antitrust immunity does not exist. *See In re Airport Car Rental Antitrust Litig.,* 693 F.2d 84, 86 (9th Cir.1982); *TEC Cogeneration Inc. v. Florida Power & Light Co.,* 76 F.3d 1560, 1572 (11th Cir.1996) (rejecting as erroneous district court's reliance on "perceived commercial exception"). *See also Independent Taxicab Drivers' Employees v. Greater Houston Transp. Co.,* 760 F.2d 607, 613 (5th Cir.1985) (holding that Noerr–Pennington extends to situations where the government enters into a contractual relationship with a private entity, "at least in situations 'where the government engages in a policy decision and at the same time acts as a participant in the marketplace.'") (citation omitted)—a circumstance not unlike ours.

Finally, Baker Norton and Zenith Goldline advance *Hecht v. Pro–Football, Inc.,* 444 F.2d 931 (D.C.Cir.1971). There, the D.C. Circuit rejected "the facile conclusion that action by any public official automatically confers exemption" from antitrust immunity. *Id.* at 934 (quoting *George R. Whitten, Jr. v. Paddock Pool Builders, Inc.,* 424 F.2d 25 (1st Cir.1970)). Instead, the Court reviewed the language and legislative history of a statutory grant of au-

thority to the District of Columbia Armory Board to construct, maintain, and rent a sports stadium, and concluded that an exemption to antitrust law was not appropriate because of the comparative importance of national antitrust policy. This court does not find that decision to be persuasive authority of the existence of the commercial exception.

■ Bristol admits that the Noerr–Pennington doctrine does not immunize all conduct that has some connection to the government, but says that the counterclaimants can not defeat immunity merely by labeling the alleged conduct "commercial." "The applicability of Noerr–Pennington depends on whether the complainant's alleged injury flows from governmental conduct or private conduct. If the injury flows directly from a governmental action then there is no liability for the private party, notwithstanding that the 'commercial' defendant urged the government to take 'commercial' action." Bristol Reply Mem. at 2–3.

That is an accurate statement of the law. Antitrust immunity is not destroyed by a commercial relationship between the government and a private actor. If that were so, courts would be called upon to frustrate First Amendment rights whenever the government stood to profit from its decisions. There is clear statutory authority to the federal agencies to enter into the CRADA, to grant the patent license, and to designate orphan drug exclusivity to Bristol. Without express declaration of Congress, the counterclaimants' proposed exception cannot swallow the reaching rule of immunity or these statutory grants.

The court finds that Bristol was engaged in protected petitioning conduct. The court grants Bristol's motion to dismiss the Sherman Act counterclaims of Baker Norton and Zenith Goldline to the extent that they allege conduct protected by the Noerr–Pennington doctrine.

**B. Baker Norton's Counterclaim for Unfair Competition**

According to Bristol, Baker Norton's counterclaim for unfair competition must be dismissed because of the Noerr–Pennington doctrine. Bristol does not object to Zenith Goldline's claim for unfair competition based on allegations of Bristol's inequitable conduct in obtaining patents and enforcing invalid patents (the *Walker Process* counterclaims).

■ Though the Supreme Court has not applied the doctrine outside the antitrust context, Bristol relies upon *Brownsville Golden Age Nursing Home v. Wells*, 839 F.2d 155, 159–60 (3rd Cir.1988), that liability for state-law causes of action cannot rest upon allegations of conduct immunized from the federal antitrust laws. There, our Circuit considered whether a Pennsylvania nursing home could bring an action under state law for civil conspiracy, tortious interference with business relations, and malicious use of process, based on allegations that private individuals and public officials had conducted a publicity and letter writing campaign that led the Department of Health to revoke the nursing home's license. Relying on the principle that the collusive use by competitors of government processes can not give rise to an antitrust violation, the Court affirmed the district court's grant of summary judgment for defendants.

Baker Norton objects that Bristol's allegedly unfair and unethical conduct states a claim for relief, independent of any efforts to petition the government. It analogizes this case to *We, Inc. v. City of Philadelphia Dep't of Licenses and Inspections*, 983 F.Supp. 637 (E.D.Pa.1997), to support a rule that state law liability attaches where a defendant's conduct "[goes] beyond merely complaining or petitioning the government." *Id.* at 639. The *We* plaintiff businesses were harmed directly by the defendant university's representatives, who had personally evicted plaintiffs' patrons. Here, Baker Norton's alleged injuries all arose from government action, not

from that of third parties. *See* Opp. Br. at 24–25 (allegations that Bristol misappropriated confidential business information, purportedly misrepresented that it would bring a breast cancer therapy to market, and misled its competitors through statements to Congress).

The New Jersey Supreme Court has not decided whether Noerr–Pennington immunity extends to state causes of action; it declined to reach the question in *Snyder v. American Ass'n of Blood Banks,* 144 N.J. 269, 676 A.2d 1036, 1049 (1996). However, the Circuit recently affirmed the *Brownsville* decision and held, with the D.C. and Ninth Circuits, that state law claims for malicious prosecution, tortious interference, and unfair competition are barred by NoerrPennington immunity. *Cheminor Drugs, Ltd. v. Ethyl Corp.,* 168 F.3d 119, 128–129 (3rd Cir.1999).

This court is satisfied that state law tort claims must be dismissed when they are grounded upon allegations of injury that arise from government action as here. Bristol's motion to dismiss Baker Norton's counterclaim for unfair competition is granted.

## III. Counterclaim for Estoppel

■ Both counterclaimants assert an estoppel claim, maintaining that Bristol promised during congressional hearings in 1991 and 1993 "that it would not bar all competition in the market for paclitaxel-based drugs and that its monopoly in the paclitaxel-based drug market was limited to ... non-patent exclusivity." The purported promises include statements that: (1) Bristol did not have a monopoly on paclitaxel because the compound [as opposed to methods of administration] is not patentable; (2) Bristol did not have exclusive intellectual property rights to make

paclitaxel; (3) any company could file a full [New Drug Application] and market paclitaxel; (4) the NCI did not require a "reasonable pricing clause" in its CRADA with Bristol because paclitaxel is not patentable; (4) " '[c]ompetition' from 'generics' was 'a near certainty in the next several years.... [N]ear-term generic competition for Taxol is a certainty because Taxol is not a patented product' "; and (5) "While TAXOL qualified for Orphan Drug status as a treatment for refractory ovarian cancer, BMS [Bristol] believed that the potential utility of TAXOL could place it outside the spirit and intent of the Orphan Drug Act. Therefore, the Company voluntarily relinquished TAXOL Orphan Drug status...." [3]

Bristol moves to dismiss on two grounds: that "[s]tatements made to Congress fall—dead center—within the protected zone of petitioning the government," and second, that the counterclaimants have not alleged the elements of promissory estoppel.

■ Our Circuit has not squarely addressed whether a claim for promissory estoppel can survive a valid assertion of Noerr–Pennington immunity. However, this court finds no reason to distinguish this claim from the tort causes of action dismissed in *Brownsville* and *Cheminor.* Those decisions were firmly anchored to the principle that liability should not be imposed for damage caused by a competitor's successful petitioning of the government. Nor were they limited, on their face, to tort claims. The *Cheminor* Court wrote: "[W]e have been presented with no persuasive reason why these state tort claims, *based on the same petitioning activity as the federal claims,* would not be

---

**3.** The counterclaimants did not attach transcripts of the congressional hearings for verification. In contrast, Bristol submitted the transcript of a 1993 congressional subcommittee hearing entitled "Pricing of Drugs Codeveloped by Federal Laboratories and Private Companies," 103d Cong. 138–39 (1993). Though the parties dispute the exact phrasing

of this last statement, the court quotes verbatim from this transcript. "A 'document integral to or explicitly relied on in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.' " *In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1426 (3rd Cir.1997) (citation omitted).

barred by the Noerr–Pennington doctrine." 168 F.3d at 128 (emphasis ours).

Here, the statements made by Bristol were offered during congressional hearings headlined, "Exclusive Agreements Between Federal Agencies and Bristol–Myers Squibb Co. For Drug Development: Is The Public Interest Protected?" and, "Pricing of Drugs Codeveloped by Federal Laboratories and Private Companies." It is apparent that these claims were made in an effort to induce favorable government action, to encourage cooperation between government agencies and drug manufacturers and to defend Bristol's paclitaxel pricing system. It is also likely, as the counterclaimants allege, that these statements were made with anticompetitive intent. Yet, Noerr has long protected such a situation from antitrust scrutiny—and in our Circuit, it is likewise protected from state law liability.

The counterclaimants also strive to portray Bristol's statements as misrepresentations, in an effort to shoehorn their allegations into the dicta of the Supreme Court's *Allied Tube* that "misrepresentations made under oath at a legislative committee hearing in the hopes of spurring legislative action" "would not necessarily be entitled to the same antitrust immunity allowed deceptive practices in the political arena." 486 U.S. at 504, 108 S.Ct. 1931. Baker Norton and Zenith Goldline characterize their adversary's testimony: "In effect, [Bristol] was asked, 'Will Bristol allow other companies to market paclitaxel?' [Bristol] answered an emphatic 'Yes!' " Opp. Br. at 35.

The court is not persuaded. Again counterclaimants stumble. Beyond the potential pleading issues raised by Fed. R.Civ.P. 9(b), it is clear that even misrepresentations made to induce government action are protected by the Noerr–Pennington doctrine. *See Armstrong Surgical Center*, 185 F.3d at 162.

The counterclaim for promissory estoppel is barred. Baker Norton and Zenith Goldline have not adequately alleged that Bristol's alleged statements injured them directly. From the well-plead allegations, the court can infer only that their competitor made certain representations in its efforts to obtain government approval. The motion to dismiss the promissory estoppel counterclaim is granted.

## IV. Baker Norton's Counterclaim for Declaratory Judgment

Bristol requests that the court dismiss, as to Baker Norton, the counterclaim for declaratory judgment that the '803 and '537 patents are invalid and unenforceable, and that the commercial manufacture, use, or sale of Paxene® pursuant to ANDA 75–297 will not infringe any claim of these patents. Bristol does not object to Zenith Goldline's claim for declaratory judgment.

■ Bristol correctly states that under 28 U.S.C. § 2201, the court must be presented with an "actual controversy" to exercise jurisdiction over a declaratory judgment action. "[T]he Declaratory Judgment Act requirement of an 'actual controversy' is identical to the constitutional requirement of 'cases' and 'controversies.' " *Interdynamics, Inc. v. Firma Wolf*, 698 F.2d 157, 166 (3rd Cir.1982) (citation omitted).

■ To maintain a declaratory judgment claim in the patent context, Baker Norton must satisfy a two-prong test to determine whether an actual case or controversy exists. First, it must be faced with an explicit threat or other action by the patent holder, Bristol, which creates a "reasonable apprehension" that it will face an infringement suit. Second, Baker Norton must be engaged in "present activity which could constitute infringement" or have taken "concrete steps ... with the intent to conduct such activity." *Cygnus Therapeutics Systems v. ALZA Corp.*, 92 F.3d 1153 (Fed.Cir.1996), *overruled in part on other grounds, Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed.Cir.1998); *see also Interdynamics*, 698 F.2d at 166–67 (employing parallel

test of "reasonable apprehension and immediate intention and ability"). Even if Baker Norton meets this standard, the court retains the discretion to dismiss the declaratory judgment claim. *See, e.g., Telectronics Pacing Systems, Inc. v. Ventritex, Inc.*, 982 F.2d 1520, 1526 (Fed.Cir. 1992).

### A. Reasonable Apprehension of Suit for Infringement

■ Bristol argues that Baker Norton cannot show a reasonable apprehension that it will be sued for infringement of the '803 and '537 patents. The party seeking declaratory relief bears the burden to establish such apprehension by a preponderance of the evidence; the test of reasonableness is an objective one. *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 888 (Fed.Cir.1992). Bristol relies on the circumstance that the present infringement action seeks relief against only Zenith Goldline and IVAX. Baker Norton, apparently a subsidiary of IVAX, *see* Opp. Br. at 38, was not named as a defendant.

Baker Norton answers that Bristol has filed patent infringement actions, presently pending in this court, against eleven companies which seek to market paclitaxel-based drugs. It further objects that it has already been sued by Bristol for its efforts to market paclitaxel in the United Kingdom. Finally, Baker Norton points to Bristol's alleged actions to block it from the United States paclitaxel market.

The court recognizes that Baker Norton need not show that it has been expressly charged with infringement; the court may consider the totality of the circumstances to determine whether Bristol's conduct rises to a sufficiently threatening level. *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed.Cir.1988). Here, Baker Norton states only that Bristol's conduct creates a reasonable apprehension that Baker Norton "*will* face a patent infringement suit *when* it attempts to market a paclitaxel-based drug [in the United States]." Opp. Br. at 38 (emphasis added). Although Baker Norton has amply demonstrated Bristol's willingness to

sue to enforce its asserted patent rights to paclitaxel, it is equally evident that Bristol chose not to sue Baker Norton now in the pending litigation. Likewise, Baker Norton has alleged nothing to show that Bristol has threatened litigation regarding Baker Norton's past unsuccessful efforts to apply for licenses to government patents or to seek FDA approval and orphan drug designation to market paclitaxel. And the court accepts Bristol's point that Baker Norton has not alleged that it is engaged in or intends to engage in any activity which would infringe the patents in suit. Bristol Mem. at 26. Accordingly, Baker Norton has not demonstrated an objectively reasonable fear of litigation by Bristol.

### B. Present Infringing Activity or Meaningful Preparation

Moreover, Bristol maintains that Baker Norton has not alleged either that it is presently engaged in activity which could infringe the '803 and '537 patents, or that it has taken concrete steps with the intent to conduct such activity. Bristol argues that Baker Norton, which it describes as a "*potential, future* infringer," cannot meet the second prong of the jurisdictional test.

Baker Norton responds that it has taken concrete steps "towards the marketing of paclitaxel." And relies on the counterclaims that trace its efforts to develop paclitaxel-based treatments for breast cancer and Kaposi's sarcoma, and attempts to secure patent licenses and FDA approval. This argument appears not to be thought through.

For although Baker Norton is correct that "[t]he actual manufacture, use, or sale of an allegedly infringing device is not a condition precedent" to a suit seeking declaratory relief to invalidate a patent, a party seeking declaratory judgment must demonstrate that it has the "immediate intention and ability" to practice a potentially infringing invention. *Rengo Co. Ltd. v. Molins Mach. Co., Inc.*, 657 F.2d 535, 539 (3rd Cir.1981). Baker Norton's allega-

tions describe a course of conduct that was ultimately unsuccessful in removing the legal barriers to its production and marketing of paclitaxel. The counterclaims allege that Baker Norton's failure has made it impossible for Baker Norton to obtain FDA approval of a paclitaxel-based drug until 2004. *See, e.g.,* Countercl. ¶ 78 ("The . . . effect of Bristol's belated acquisition of an exclusive license under the CRADA . . . was to prevent Baker Norton and others from developing a paclitaxel-based drug that would receive FDA approval."); Countercl. ¶ 92 ("The . . . effect of Bristol's filing of a Supplemental NDA for Kaposi's sarcoma and its application for orphan drug marketing exclusivity for that indication was to block Baker Norton from receiving FDA approval to market a paclitaxel-based drug for the treatment of Kaposi's sarcoma until 2004.")

Crucial to this inquiry, the court observes that ANDA 75–297, the application that forms the basis for this infringement suit, was filed *only* by Zenith Goldline, purportedly with the assistance of IVAX. Compl. ¶ 13. Baker Norton has not claimed that it is now prepared to submit a renewed application for FDA approval, or that it has conducted any other "meaningful preparation" which would bring it close to an imminent ability to infringe on Bristol's patents. *Arrowhead,* 846 F.2d at 736; *see also* Countercl. Prayer for Relief at 41 (requesting declaration that Zenith Goldline and IVAX have not infringed, and that the manufacture, use and sale of Paxene® pursuant to ANDA 75–297 will not infringe Bristol's patents). Should the court declare Baker Norton's rights at this stage, it would be declaring an advisory opinion about some "merely contemplated activity." *Arrowhead,* 846 F.2d at 736. Such is not permissible.

The Federal Circuit found no adjudicable controversy where a purportedly infringing invention had only recently begun clinical trials and "was years away from potential FDA approval." *Telectronics,* 982 F.2d at 1527. Such circumstances fail to demonstrate the requisite immediacy here as there. *See Lang v. Pacific Ma-* *rine and Supply Co., Ltd.,* 895 F.2d 761, 764 (Fed.Cir.1990) (finding no actual controversy where allegedly infringing invention would not be completed until at least 9 months after declaratory judgment complaint was filed). Because Baker Norton cannot satisfy the jurisdictional test, the motion to dismiss Baker Norton's claim for declaratory judgment is granted.

## V. Bristol's Motion to Strike Pursuant to Fed.R.Civ.P. 12(f)

Federal Rule of Civil Procedure 12(f) authorizes the court to strike from the pleadings "any redundant, immaterial, impertinent, or scandalous matter." Bristol so moves to strike those portions of the counterclaims that concern Bristol's actions to obtain government licenses and approvals to the detriment of Baker Norton, Baker Norton's efforts to develop paclitaxel-based treatments for breast cancer and Kaposi's sarcoma, and Bristol's 1991 and 1993 statements to Congress. Bristol does not object to the *Walker Process* allegations, which describe Bristol's alleged conduct before the Patent and Trademark Office to obtain the '803 and '537 patents, and its present efforts to enforce those patents.

The purpose of a motion to strike is to save time and expense through the excision of matter from the pleadings that will not affect the outcome of the case. *Glenside West Corp. v. Exxon Co., U.S.A.,* 761 F.Supp. 1100, 1114–15 (D.N.J.1991). Motions to strike are "not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues." *Tonka Corp. v. Rose Art Industries, Inc.,* 836 F.Supp. 200, 217 (D.N.J. 1993) (citation omitted). A motion to strike should not be used as a vehicle to determine disputed and substantial questions of law or fact. *Glenside West Corp.,* 761 F.Supp. at 1115.

■ Bristol argues that the allegations at issue are superfluous to the "real issues" of infringement, validity, and enforceability of the '803 and '537 patents. The court agrees. The court has dismissed for failure to state a claim for relief the counterclaims for Sherman Act violations, unfair competition as to Baker Norton, and estoppel, and denied declaratory judgment to Baker Norton. These rulings dispose of any argument that the allegations supporting these claims could affect the outcome of this action. And, such allegations are likely to cause unfair prejudice to Bristol and unduly complicate the trial.

Accordingly, the court grants Bristol's motion to strike portions of the counterclaims: The excised pleadings are annexed to this opinion.

**CONCLUSION**

The motion by Bristol–Myers Squibb to dismiss certain allegations of Counts III and IV of the counterclaims by Baker Norton and Zenith Goldline (for Sherman Act violations) is granted to the extent that the counterclaims allege conduct protected by the Noerr–Pennington doctrine. Bristol's motion to dismiss Count I as to Baker Norton (unfair competition) is granted. The motion to dismiss Count II as to both Baker Norton and Zenith Goldline (promissory estoppel) is granted. The motion to dismiss Count V as to Baker Norton (declaratory judgment) is granted. Bristol's motion to strike portions of the counterclaims pursuant to Fed.R.Civ.P. 12(f) is granted.

The court recognizes that Baker Norton and Zenith Goldline seek leave to file amended counterclaims to "[detail] Bristol's series of wrongful acts, including but not limited to the time and manner of Bristol's misappropriation and misuse of confidential IVAX research protocols and other confidential business information." *See* Letter to the Court from IVAX Corporation, Baker Norton, Zenith Goldline, and Immunex, dated January 3, 2000. Fed. R.Civ.P. 15(a) grants this court the discretion to permit such an amendment. *Kauff-*

*man v. Moss*, 420 F.2d 1270, 1276 (3rd Cir.1970). However, pursuant to N.J. Local Civ. Prac. R. 4:9–1, the counterclaimants are directed to submit a copy of the proposed amended counterclaims to accompany a formal motion for leave to amend. Upon consideration of such, the court will determine whether the proposed amendment might resuscitate the pleadings, or whether it would be futile.

**ORDER**

This matter comes before the court on the motions by Plaintiff–Counterclaim Defendant Bristol–Myers Squibb to dismiss various counterclaims by Baker Norton Pharmaceuticals and Zenith Goldline Pharmaceuticals. Bristol moves pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss all counterclaims of Baker Norton, and the estoppel claim (Count II) of Zenith Goldline. Bristol also moves to dismiss Zenith Goldline's counterclaims to the extent that they relate to allegations of conduct immunized by the Noerr–Pennington doctrine (portions of Counts I, II, III, and IV), and to strike such portions of the pleadings pursuant to Fed.R.Civ.P. 12(f).

Upon consideration of the submissions of the parties and for the reasons stated in the accompanying opinion,

It is on this day of January, 2000:

ORDERED that:

1. Bristol's motion to dismiss certain allegations of Counts III and IV of the counterclaims (for Sherman Act violations) is granted; such allegations are dismissed to the extent that they allege conduct protected by the Noerr–Pennington doctrine;

2. Bristol's motion to dismiss Count I (unfair competition) of Baker Norton's counterclaims is granted;

3. Bristol's motion to dismiss Count II (estoppel) as to both Baker Norton and Zenith Goldline is granted;

4. Bristol's motion to dismiss Count V (declaratory judgment) as to Baker Norton is granted; and

5. Bristol's motion to strike portions of the counterclaims pursuant to Fed. R.Civ.P. 12(f) is granted. The excised pleadings are annexed to this order.